UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 14-20050-CIV-COOKE/TORRES

DIRECT GENERAL INSURANCE    )
COMPANY,                    )
                            )
        Plaintiff,          )
                            )
   vs.                      )
                            )
                            )
INDIAN HARBOR INSURANCE     )
COMPANY, HOUSTON CASUALTY   )
COMPANY and NATIONAL SPECIALTY )
INSURANCE COMPANY,          )
                            )
                            )
        Defendants.         )

**DEFENDANTS' JOINT MOTION TO EXCLUDE PROPOSED TESTIMONY OF
MICHAEL L. AVERILL AND TIMOTHY WICKER AND
INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rules 702 and 403 of the Federal Rules of Evidence and Southern District of Florida Local Rule 7.1, defendants Houston Casualty Company ("Houston Casualty") and National Specialty Insurance Company ("National Specialty") hereby file their Motion to Exclude Proposed Testimony of Michael L. Averill ("Averill") and Timothy Wicker ("Wicker") and Incorporated Memorandum of Law.

Plaintiff Direct General Insurance Company ("Direct") retained Averill and Wicker to provide purported expert testimony on matters of insurance policy interpretation. This proposed testimony must be excluded because it consists of nothing more than legal conclusions that impermissibly usurp the role of the Court. In fact, these opinions go to the *central legal issue in this case*: whether the class actions and over 70,000 individual demands and lawsuits that Direct submitted for coverage and certain pre-policy demands that Direct did not submit for coverage

constitute Related Claims, and therefore a single Claim that must be deemed to have been made prior to the inception of the policies. Notably, when Direct believed that its interests were served by combining the class actions and over 70,000 individual demands and lawsuits into a single Claim, it readily alleged and argued on summary judgment, without any expert assistance, that each demand and lawsuit constituted a Claim for Wrongful Acts and, together with the class actions, constituted Related Claims. But now that Direct realizes that the same legal analysis that led it to this straight-forward conclusion will place its single Claim outside the policies' coverage, it tries to muddy clear waters by offering experts to opine as to the meaning of these clear and unambiguous policy terms.

It is the province of this Court to interpret these terms as a matter of law and it can do so with the same ease that enabled Direct to conclude in its prior filings that the class actions, individual demands and lawsuits constitute Related Claims.

The testimony proffered by Averill and Wicker is merely an attempt by Direct to argue its case under the guise of "expert" authority. This is exactly the type of testimony that the Supreme Court and the Eleventh Circuit have repeatedly held misleading and impermissible. As discussed more fully below, this testimony must also be excluded because it lacks any objective basis or accepted standard, and relies exclusively on the alleged personal experience of the proposed experts without regard to contradictory recognized authorities.

## BACKGROUND FACTS

This case involves excess indemnity policies issued by Houston Casualty and National Specialty to Direct for the period March 30, 2008 to March 30, 2009 (the "Policies"). These are "claims made" policies, which only provide coverage for Claims first made during that policy

period. Defendants' Statement of Material Facts (ECF No. 119) ("Stmt.") at ¶¶ 1-4.[1]

Also at issue in this case is the January 1, 2008 re-enactment of the Florida personal injury protection ("PIP") statute, which established a protocol for the payment of policy benefits under automobile insurance policies. Under that statute, Direct construed its automobile insurance policies to permit it to reimburse its policyholders for 80% of the charges listed on a statutory fee schedule and applied that fee schedule to all losses that occurred on or after the statute's effective date. Almost immediately after the statute's re-enactment, Direct began receiving statutory demand letters alleging that it had not paid the full amount of benefits owed under the PIP statute and threatening to sue Direct if it did not make full payment. Direct ultimately received over 70,000 such claims (the "Individual Claims"), which it allegedly settled for more than $62 million. However, Direct waited six years to notify defendants of the Individual Claims, and then immediately filed this action seeking a declaration of insurance coverage for the Individual Claims and two purported class actions (collectively, the "PIP Claims"). Stmt. ¶¶ 14, 21-22, 35.

In submitting the Individual Claims for coverage, Direct contended that all of those Claims and the first purported class action (the "Advantage MRI Action") should be deemed Related Claims first made during the period of the Policies. *Id.* ¶ 21. Since that time, Direct has changed its legal theory, arguing that only those Individual Claims asserting a so-called "permissive methodology" constitute Related Claims. *See* Plaintiff's [Corrected] Response in Opposition (ECF No. 132) at 14.

Defendants maintain that, as a matter of law, the PIP Claims, if they are all Related

---

[1] Indian Harbor Insurance Company ("Indian Harbor"), which issued the underlying policy, was also named as a defendant in this coverage action but reached a settlement with Direct and was dismissed from the case. *See* ECF No. 99.

3

Claims, must be deemed a single Claim made on the date of the earliest such Claim. Because the earliest such Claim was received before the Policies incepted (*i.e.,* during the period of an earlier policy issued by Houston Casualty), there can be no coverage for the PIP Claims under the Policies at issue here. Defendants' Joint Motion for Summary Judgment (ECF No. 119) at 8-16; Defendants' Reply Brief (ECF No. 139) at 1-9.

On January 2, 2015, Direct served on defendants a copy of the report disclosing Averill's proposed testimony, attached hereto as Exhibit A ("Averill Report"). On the same date, Direct served on defendants a copy of the report disclosing Wicker's proposed testimony, attached hereto as Exhibit B ("Wicker Report").

On March 19 and 20, 2015, defendants took the depositions of Wicker and Averill, respectively. *See* Deposition Transcript of Michael J. Averill (excerpt), attached hereto as Exhibit C ("Averill Dep."); and Deposition Transcript of Timothy J. Wicker (excerpt), attached hereto as Exhibit D ("Wicker Dep.").

As explained below, these reports and the subsequent deposition testimony demonstrate that Averill and Wicker have nothing more to offer than inadmissible legal conclusions and unsubstantiated testimony regarding purported "industry custom" that contravenes recognized authorities and, if accepted, would fundamentally alter the clear and unambiguous language of the Policies.

## MEMORANDUM OF LAW

### I.   Standard for Admissibility of Expert Opinions

Pursuant to Rule 702 of the Federal Rules of Evidence, an expert may provide opinion testimony if qualified by "knowledge, skill, experience, training, or education" and if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

In this regard, the trial court acts as a gatekeeper to "ensure that speculative, unreliable expert testimony does not reach the jury." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (same). This requires a "rigorous" three-part inquiry, considering whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable … ; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The party offering the expert testimony bears the burden of laying the proper foundation for the admission of such testimony, and of proving, by a preponderance of the evidence, that the testimony is reliable and admissible. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306, 1312 (11th Cir. 1999).

As particularly relevant here, an expert cannot be qualified to offer legal conclusions since such testimony would improperly usurp the role of the court and invade the province of the jury. *Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (expert may not tell jury what result to reach); *Chick-Fil-A, Inc., v. CFT Develop., LLC*, No. 07-cv-501, 2009 WL 1754058, at *3 (M.D. Fla. June 18, 2009). Only the judge can instruct the jury on the relevant legal standards. *See, e.g., Johnson v. Bush*, 2002 WL 34355953, at *1 & n.1 (S.D. Fla. Apr. 19, 2002) ("Each courtroom comes equipped with a 'legal expert,' called a judge" (citation omitted)). This includes instruction on the meaning of specific insurance policy language, which remains an issue of law solely for the court. *See Montgomery*, 898 F.2d at 1541 (district court

5

abused discretion in permitting expert witness to testify about insurer's obligations under policy).

Also relevant here, an individual's experience in a particular field, standing alone, is not enough to render *any* conceivable opinion of that expert reliable. *Id.* at 1261. Indeed, "if the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply taking the expert's word for it." *See Frazier,* 387 F.3d at 1262 (quoting Committee Note to 2000 Amendments of Rule 702) (emphasis in original).

In the end, the importance of the court's gatekeeping function "cannot be overstated" since an expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* at 1260 (*quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595 (1993)).

## II.     Testimony Regarding Legal Conclusions Must Be Excluded

Averill and Wicker's reports are filled with legal conclusions about how the Policies should be interpreted. Most notably, Averill states that the PIP demands received by Direct before the Policies incepted (the "Pre-Policy PIP Demands") are not Claims under the Policies (Averill Report 11); and, on the ultimate legal question here, states that the "Policies issued by Houston Casualty and National Specialty should afford coverage" (*id.* at 13). Averill expressed similar legal conclusions in his deposition testimony. *See, e.g.,* Averill Dep. 145:8-13 ("[T]o my recollection, most of [the Pre-Policy PIP Demands] were just merely demands for payment of PIP benefits and not claims, as defined in the professional liability insurance policy"); 177:6-179:17 (opining that specific Pre-Policy Demands do not constitute Claims under the Policies). Wicker also states that the Pre-Policy PIP Demands are not Claims under the Policies (Wicker Report 9), and expressed similar legal conclusions in his deposition testimony. *See, e.g.,* Wicker

6

Dep. 105:1-16 (testifying that individual demands and lawsuits received by Direct before its general counsel became aware of Advantage MRI Action were not Claims under the Policies). Based on these statements, he concludes that the existence of such Demands "is unimportant and should have no bearing on coverage." Wicker Report 14, 15.

In offering these opinions, Averill and Wicker stray beyond the bounds of admissible expert testimony and attempt to commandeer the role of the Court. *See, e.g., N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.*, No. 88C-JA-155, 1995 WL 628447, at *3 (Del. Super. Apr. 22, 1995) ("[The law] firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract. Such testimony is reversible error and is not repaired by cross-examination" (*citing Montgomery*, 898 F.2d 1537)).

The Court does not require expert assistance here because the questions of whether the Pre-Policy PIP Demands constitute Claims for Wrongful Acts and whether all of the PIP Claims are Related Claims that must be treated as a single Claim under the Policies present purely legal issues that are routinely decided by the courts as a matter of law. *See, e.g., KB Home v. St. Paul Mercury Ins. Co.*, 621 F. Supp. 2d 1271, 1275-78 (S.D. Fla. 2008), *aff'd sub nom. KB Home v. The Travelers Ins. Co.*, 339 F. App'x 910 (11th Cir. 2009); *Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.*, 499 F. App'x 559, 567-68 (6th Cir. 2012); *Powell v. Clark*, No. M201401083COAR3CV, 2015 WL 479802, at *3 (Tenn. Ct. App. Feb. 3, 2015). This explains why courts routinely hold that experts may not testify about the scope or extent of coverage under an insurance policy. *See, e.g.*, *FNB Bank v. Park Nat. Corp.*, 996 F. Supp. 2d 1187, 1192 (S.D. Ala. 2014) (precluding testimony because it "would appear to constitute a legal conclusion, which [expert] may not deliver"); *Gowen Oil Co. v. United Fuel Exp., Inc.*, No. CV212-001, 2013 WL 85081, at *1 (S.D. Ga. Jan. 7, 2013) ("an expert's opinion as to whether coverage

exists under an insurance policy is an impermissible legal conclusion").

Moreover, Direct itself concluded in its Amended Complaint that each of the more than 70,000 individual PIP demands and complaints for which it seeks coverage constitutes a single Claim for Wrongful Acts. Stmt. ¶ 41. It also concluded in both its Amended Complaint and its prior summary judgment filings that these Claims, along with the class actions, are Related Claims and therefore should be treated as a single Claim. *Id.* ¶ 21; Direct General's Motion for Partial Summary Judgment (ECF No. 60) at 17 ("The PIP Complaints for which [Direct] seeks reimbursement of Defense Expenses are Related Claims" and "are related to the class actions and to each other because they allege the same factual nexus: [Direct's] alleged misinterpretation of its automobile policies and Florida PIP Statute"). Having reached these legal conclusions with such ease and certainty in its prior filings, Direct cannot now credibly assert that these determinations require a level of technical or specialized expertise that goes beyond the capabilities of the Court.

**III.   Testimony Regarding Alleged Industry Customs Must Be Excluded**

Throughout their reports, Averill and Wicker make several unsubstantiated assertions regarding "industry custom and practice." These assertions are improper for several reasons.

*First*, a court may not consider any extrinsic evidence of intent, including industry custom and practice, unless the policy language at issue is ambiguous. *See, e.g., Memphis-Shelby Cnty. Airport Auth. v. Illinois Valley Paving Co.*, No. 01-3041 B, 2006 WL 2385300, at *6 (W.D. Tenn. Aug. 17, 2006) (evidence of industry custom or practice inadmissible to interpret contract in absence of ambiguity); *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 272 (Tenn. Ct. App. 1990) (testimony regarding trade custom irrelevant where contract is unambiguous). Here, plaintiff has not alleged the existence of *any* ambiguity in *any* portion of the Policies. Absent

ambiguity, all of Averill and Wicker's testimony regarding industry custom and practice is irrelevant and therefore must be excluded. *Allison*, 184 F.3d at 1320 ("[p]roffered expert testimony must meet the legal as well as the substantive issues of the case").[2]

***Second***, even if the Court was inclined to admit testimony on industry custom and practice, Averill and Wicker's testimony should be excluded because it lacks foundation. In this regard, both individuals simply ask the Court to "take their word for it" as to how the Policies should be interpreted. *See, e.g.,* Averill Report 4 ("Under industry custom and practice, following form excess insurers will pay a claim paid by the underlying insurer if the claim reaches the excess policies' limits"), 11 ("The treatment of Related Claims as proffered by Direct General, in my opinion, follows the common practice of the industry"); Wicker Report 15 ("The pre-March 30, 2008 pre-litigation demand letters and other correspondence I reviewed were not Claims within the meaning of the Insurance Company Professional Liability Policy, as that term is understood by knowledgeable insurance professionals"). Averill made similar statements in his deposition testimony. *See, e.g.,* Averill Dep. 107:18-108:3 (citing personal experience writing excess policy language and actions of those excess carriers as basis for statement that defendants should follow the fortunes of Indian Harbor).

Such statements do not meet the *Daubert* standard. *See Haller v. AstraZeneca Pharm., L.P.*, 598 F. Supp. 2d 1271, 1299 (M.D. Fla. 2009) ("The predominant lesson of *Daubert* is that federal courts are not simply to take the expert's 'word for it'"). On the contrary, the expert must demonstrate that a specific, objective industry-wide standard exists as to specific measures that should have been taken and demonstrate how it applies to the facts of the case. *See Kaufman v. Pfizer Pharmaceuticals, Inc.*, 2011 WL 7659333, at *7 (S.D. Fla. Aug. 4, 2011).

---

[2] Although the admissibility of evidence in this case is governed by the Federal Rules of Evidence, the parties agree that Tennessee law applies to the interpretation of the Policies.

More importantly, these statements must be excluded because they do not inform the Court's interpretation of the Policies' unambiguous language, but rather attempt to ***change*** that language. For example, both Averill and Wicker suggest that Direct's notice of the PIP Claims was timely because Direct acted in a manner that was consistent with "industry custom." *See* Averill Report 5 ("Consistent with this industry custom and practice, the [Policies] do not require notice until [Direct's] risk manager or general counsel becomes aware of the claim"); Wicker Report 14 ("It was a reasonable business action and within the latitude of the insurance policy, as understood by knowledgeable insurance professionals, and by custom and practice, … to not give notice of any related individual demands and lawsuits until they arose to the attention of the General Counsel as claims"). However, these statements ignore the Policies' requirement that notice of a Claim be provided "in no event later than sixty (60) days after the end of the Policy Period." First Am. Compl., Ex. D (ECF No. 37-4) at Endorsement No. 6. Further, Wicker contends that Direct should be afforded "latitude" in its compliance with the Policies' terms (Wicker Report 13), yet he cannot point to any provision in the Policies that would give Direct such latitude. Such statements seek to insert new and different meanings into an otherwise unambiguous policy, all without a basis in law or an identifiable standard. The testimony is therefore improper and must be excluded.[3]

### IV. Averill and Wicker's Opinions Are Unreliable

Averill and Wicker have also failed to satisfy the *Daubert* requirements for reliability. As stated above, expert testimony must be the product of "reliable principles and methods." Fed. R.

---

[3] Averill also attempts to use "industry custom and practice" to change the plain meaning of the Policies' definitions. For example, when asked to point to specific language in the Policies' definition of Wrongful Acts that would support his view that an alleged failure to pay PIP benefits does not constitute an alleged "omission," he said: "There's no specific language. That is the normal custom and practice in the insurance industry." Averill Dep. 176:13-177:4.

Evid. 702. When assessing whether proffered testimony is reliable, courts consider a number of factors, including whether the theory or technique has been subject to peer review, whether the theory or technique is generally accepted in the scientific community, and whether there is an applicable objective standard. *Daubert*, 509 U.S. at 593-94. Here, Averill and Wicker's opinions fail to satisfy any of these criteria.

### A. Averill and Wicker's Opinions Lack Any Recognized Basis

Neither Averill nor Wicker identify any industry standard to support their assertions. Indeed, the only articulated "source" for their opinions is their own credentials, a position consistently rejected by courts. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (district court properly excluded expert testimony based only on the *ipse dixit* of the expert); *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1201 (11th Cir. 2010) ("[t]rial court's gatekeeping function requires more than simply taking the expert's word for it.") (citation omitted); *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert") (*quoting Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998)). As the Eleventh Circuit held in *Frazier*:

> "[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. … If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong."

387 F.3d at 1261 (emphasis in original), *quoting* Committee Note to the 2000 Amendments of Rule 702.

In his entire fourteen page report, Averill cites no authority other than himself. Rather

11

than providing *objective* authorities to support his opinion, Averill relies on his experience from *his own practice*. For example, Averill explains that "[d]uring the course of my approval of claims against the Home in Run-Off, I approved the same treatment of related claims as Direct General proposes." Averill Report 11. However, the Court has no reason to believe that Averill's practices or treatment of claims was consistent with industry standards. Even if the Court believed that Averill's prior practices were consistent with industry standards, the Court has no basis for concluding that the policies and claims involved in his prior work are akin to those addressed here.

Similarly, Wicker articulated no support for his opinions, except for his own experience. *See, e.g.*, Wicker Report 10 ("Based on my experience…"), 12 ("In my experience…" and "from my personal experience…"), 14 ("Based on my 25+ years of experience…" and "drawing on my brokering experience…"). Noticeably absent from the Wicker Report is *any* reference to *any* objective standard, publication, case law, or other recognized authority to support Wicker's subjective view. Again, the Court has no reason to conclude that Wicker's "experience" is consistent with industry standards.

In short, there is simply no measure by which the Court can conclude that Averill and Wicker's opinions are reliable.

> B.  **Averill's Opinion Regarding the "Follow the Fortunes" Doctrine Contradicts the Relevant Case Law and Is Not Supported by Policy Language or Recognized Industry Standards**

A substantial portion of Averill's proposed testimony rests on his understanding of a legal doctrine known as the "follow the fortunes" doctrine. According to Averill, this doctrine means "if the Underlying Policy applies, then the Company Policies apply, provided that the Underlying Policy's limit of insurance is exhausted." Averill Report 7. Thus, according to

12

Averill, because Indian Harbor paid its remaining limits to settle the coverage action brought by Direct, Houston Casualty and National Specialty must "follow the fortunes" of Indian Harbor and pay their policy limits as well. *Id.* at 4, 9, 13.

Even if the Court were to admit Averill's testimony as to how this doctrine should be applied to the facts of this case (an impermissible legal conclusion), the Court should exclude Averill's proposed testimony on this subject because it directly contradicts the relevant case law. As one leading insurance law treatise has explained: "'***Following form' is not the same as the reinsurance concept of 'follow the fortunes***.' Phrased a bit differently, a following form excess insurer agrees only to follow the terms of the primary insurance policy, ***not the primary insurer's interpretation of those terms***." 4-24 New Appleman on Insurance Law Library Edition § 24.02[2] (emphasis added). Similarly, one court held: "'following form' provisions are distinguished from 'follow the fortunes' clauses…Thus [the excess insurer] is entitled to challenge [the primary insurer's] decision to pay this claim." *Am. Home Assur. Co. v. Oceaneering Int'l, Inc.*, No. H-06-2105, 2008 WL 2169411, at *5 (S.D. Tex. May 22, 2008). Other courts have reached a similar conclusion. *See, e.g., Weeks Marine, Inc. v. Am. Steamship Owners Mut. Protection & Indemnity Assoc., Inc.*, No. 08-Civ.-9878, 2011 WL 3796331, at *6 (S.D.N.Y. Aug. 24, 2011) ("excess policies do not contain the 'follow the fortunes' clauses that typify reinsurance contracts and leave reinsurers 'little room to dispute the reinsured's conduct of the case'" (citation omitted)); *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 428 (Mass. 2007) ("An excess carrier's intent to incorporate the same words used in a separate agreement between the primary insurer and the insured does not imply an intent by the excess carrier to accept decisions made by the primary carrier about the extent of its obligations under its own agreement"); *cf., e.g., North River Ins. Co. v. CIGNA Reinsurance Co.*,

13

52 F.3d 1194, 1199 (3d Cir. 1995) (explaining rationale for "follow the fortunes" doctrine in reinsurance industry). Averill cannot cite any recognized authority to the contrary.[4]

In any event, Averill's testimony on this subject must be excluded because, as Averill himself admits, it is not based on any specific language in the Policies. In this regard, he states that he is relying generally upon "the insuring agreement language in the preambles for the policies." Averill Dep. 107:1-11. Yet none of the policy language describing the relationship between the Indian Harbor policy and defendants' Policies states that defendants "follow the fortunes" of Indian Harbor. *See id.* at 16:10-20:22.

Moreover, to the extent Averill's testimony on this subject is based on his personal experience, such testimony must also be excluded because he has not established that his experience is consistent with industry-wide standards. In this regard, Averill is only able to say that he heard "many of the brokers [he worked with] used 'follow form' and 'follow-the-fortunes' interchangeably." *Id.* at 106:20-23. Since Averill cannot demonstrate general acceptance of his opinion within the insurance industry -- an opinion that is expressly contradicted by a leading treatise in the area -- his testimony on this subject must be excluded. *See, e.g., United States v. Gilliard*, 133 F.3d 809, 815 (11th Cir. 1998) (affirming exclusion of expert testimony where expert failed to show general acceptance in scientific community).

### V. Averill and Wicker's Proposed Testimony Will Confuse, Rather Than Help, the Trier of Fact

It is axiomatic that expert testimony, in order to be admissible, must be helpful to the trier

---

[4] According to Averill, Appleman states that "some courts may not recognize the fact that companies can interpret the underlying policy differently than the primary insurer." Averill Dep. 59:7-14. However, Appleman states that courts only "occasionally" adopt this contrary view and, in support, cites only one such decision from Pennsylvania. *See* 4-24 New Appleman on Insurance Law Library Edition § 24.02[2] & n.27. Averill acknowledges that he is unaware of any circumstances in which a court has applied the follow-the-fortunes doctrine to excess insurers that follow form to a primary policy. Averill Dep. 233:21-25.

of fact and not merely helpful to the proponent's case. Testimony that simply tells the jury what result to reach is unhelpful and inappropriate. *Montgomery*, 898 F.2d at 1541; *Umana-Fowler v. NCL (Bahamas) Ltd.*, No. 13-23491-CIV, 2014 WL 4832297, at *2 (S.D. Fla. Sept. 19, 2014). Similarly, testimony that offers nothing more than what the proponent's attorneys could argue is unhelpful and inadmissible. *See Frazier*, 387 F.3d at 1262-63 ("Expert testimony will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments"). Here, rather than illuminating contested issues, the proposed testimony simply espouses Direct's desired legal conclusions. Indeed, the reports prepared by Averill and Wicker do little more than layer an expert gloss on Direct's legal arguments.

Courts have consistently held such testimony to be inadmissible, not only because it fails to satisfy the requirements of Rule 702, but it violates Rule 403 of the Federal Rules of Evidence. The Eleventh Circuit has held that testimony akin to Averill's and Wicker's should be kept from the jury due to "its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison*, 184 F.3d at 1311-12. Indeed, courts must be particularly cautious to exclude unreliable or confusing expert testimony because "expert testimony may be assigned talismanic significance in the eyes of lay jurors." *Frazier*, 387 F.3d at 1263. That warning is particularly warranted here. Averill and Wicker parrot the words of plaintiff's counsel, in the apparent hope that those words will carry more weight coming from the mouths of "experts." This is not the purpose of expert testimony, and both experts should be excluded.

## **CONCLUSION**

For the reasons set forth herein, Houston Casualty and National Specialty respectfully request that the Court preclude Michael L. Averill and Timothy J. Wicker from testifying in this

matter as expert witnesses, and grant Houston Casualty and National Specialty such other and further relief as the Court deems proper.

## RULE 7.1 CERTIFICATION

Counsel for defendants hereby certify that they have made reasonable efforts to confer in good faith with counsel for plaintiff regarding the relief sought in this motion. Counsel for plaintiff has stated that plaintiff will oppose this motion.

Dated: April 13, 2015.

Respectfully submitted,

_s/ Lionel F. Rivera_____
MOUND COTTON WOLLAN
& GREENGRASS
Lionel F. Rivera (Fla. Bar No. 88795)
101 N.E. Third Avenue, Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 467-5800
Fax (954) 467-5880
lrivera@moundcotton.com

SHIPMAN & GOODWIN LLP
Alexander R. Karam, Esq. (*pro hac vice*)
1875 K Street, NW, Suite 600
Washington, DC 20006-1251
Tel.: (202) 469-7781
Fax: (202) 469-7051
akaram@goodwin.com

Mark K. Ostrowski, Esq. (*pro hac vice*)
One Constitution Plaza
Hartford, CT 06103-1919
Tel.: (860) 251-5634
Fax: (860) 251-5216
mostrowski@goodwin.com

*Counsel for Defendant,*
*Houston Casualty Company*

_s/ Thomas J. Meeks *(with consent)*_____
CARLTON FIELDS JORDEN BURT, PA
Thomas J. Meeks, Esq.
(Fla. Bar No. 314323)
Steven Jeffrey Brodie, Esq.
(Fla. Bar No. 333069)
Jason Patrick Kairalla, Esq.
(Fla. Bar No. 594601)
Daniel Gonzalo Enriquez, Esq.
(Fla. Bar No. 85864)
Gwynne A. Young, Esq.
100 S.E. Second Street, Suite 4200
Miami, FL 33131
Tel. (305) 530-0050
Fax (305) 530-0055
tmeeks@cfjblaw.com
sbrodie@cfjblaw.com
jkairalla@cfjblaw.com
denriquez@cfjblaw.com
gyoung@cfjblaw.com

*Counsel for Defendant,*
*National Specialty Insurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 14-20050-CIV-COOKE/TORRES

DIRECT GENERAL INSURANCE )
COMPANY, )
 )
      Plaintiff, )
 )
vs. )
 )
 )
INDIAN HARBOR INSURANCE )
COMPANY, HOUSTON CASUALTY )
COMPANY and NATIONAL SPECIALTY )
INSURANCE COMPANY, )
 )
 )
      Defendants. )

## CERTIFICATE OF SERVICE

    I hereby certify that on April 13, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

    \_s/ Lionel F. Rivera_____
    Lionel F. Rivera (Fla. Bar No. 88795)
    lrivera@moundcotton.com
    Mound Cotton Wollan & Greengrass
    101 N.E. Third Avenue, Suite 1500
    Fort Lauderdale, FL 33301
    Tel. (954) 467-5800
    Fax (954) 467-5880
    *Counsel for Defendant,*
    *Houston Casualty Company*

## SERVICE LIST

**Direct General Insurance Company v. Indian Harbor Insurance Company; Houston Casualty Company; and National Specialty Insurance Company**

**CASE NO.: 14-CV-20050**
**United States District Court, Southern District of Florida**

| | |
|---|---|
| Katherine J. Henry, Esq.<br>Bradley Arant Boult Cummings, LLP<br>1615 L. Street, NW<br>Washington, DC 20036<br>Tel. (202) 719-8244<br>Fax (202) 719-8344<br>khenry@babc.com<br>*Counsel for Plaintiff,*<br>*Direct General Insurance Company* | Thor Y. Urness, Esq.<br>Bradley Arant Boult Cummings, LLP<br>1600 Division Street, Suite 700<br>Nashville, TN 37203<br>Tel. (615) 252-2384<br>Fax (615) 252-6380<br>turness@babc.com<br>*Counsel for Plaintiff,*<br>*Direct General Insurance Company* |
| Dylan C. Black, Esq.<br>Bradley Arant Boult Cummings LLP<br>1819 Fifth Avenue North<br>Birmingham, AL 35203<br>Tel. (205) 521-8296<br>Fax (205) 521-8800<br>dblack@babc.com<br>*Counsel for Plaintiff,*<br>*Direct General Insurance Company* | Steven Wayne Davis, Esq.<br>Stephen N. Zack, Esq.<br>Boies, Schiller & Flexner LLP<br>100 S.E. 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel. (305) 539-8400<br>Fax (305) 539-1307<br>sdavis@bsfllp.com<br>szack@bsfllp.com<br>*Counsel for Plaintiff,*<br>*Direct General Insurance Company* |
| Steven Jeffrey Brodie, Esq.<br>Jason Patrick Kairalla, Esq.<br>Daniel Gonzalo Enriquez, Esq.<br>Gwynne A. Young, Esq.<br>Thomas Meeks, Esq.<br>Carlton Fields Jorden Burt, PA<br>100 S.E. Second Street, Suite 4200<br>Miami, FL 33131<br>Tel. (305) 530-0050<br>Fax (305) 530-0055<br>sbrodie@cfjblaw.com<br>jkairalla@cfjblaw.com<br>denriquez@cfjblaw.com<br>gyoung@cfjblaw.com<br>tmeeks@cfjblaw.com<br>*Counsel for Defendant,*<br>*National Specialty Insurance Company* | |