# Bailey Opposition

# Exhibit B

# EXPERT REPORT

# MICHAEL L. AVERILL, CPCU, MBA

### DIRECT GENERAL INSURANCE COMPANY

### v.

### INDIAN HARBOR INSURANCE COMPANY, HOUSTON CASUALTY COMPANY, and NATIONAL SPECIALTY INSURANCE COMPANY

### JANUARY 2, 2015

### CONFIDENTIAL

### SUBJECT TO STIPULATION AND AGREED PROTECTIVE ORDER

## INTRODUCTION

My name is Michael L. Averill.  I have been employed in the Property & Casualty ("P&C") insurance business since June 1971.  I have a Bachelor of Science Degree from St. Peter's University in Jersey City, New Jersey and a Masters of Business, with High Distinction, from Rivier University in Nashua, New Hampshire.  I also am a Chartered Property Casualty Underwriter having received that Designation in 1980.

I have been retained by Bradley Arant Boult Cummings LLP on behalf of Direct General Insurance Company ("Direct General") to review materials in connection with a dispute between Direct General and Houston Casualty Insurance Company ("Houston Casualty") and National Specialty Insurance Company ("National Specialty") (collectively, the "Companies"), and to offer opinions concerning the customs and practices in the P&C insurance industry relating to:

1.  Professional liability insurance coverage in general and the professional liability insurance policies issued to Direct General in particular. (Houston Casualty issued policy no. 24-MG-08-A9068, a renewal of 24-MG-07-A8548, with a policy period of 03/30/2008 to 3/30/2009, and National Specialty issued policy no. IRH 00EDL0802001, also with a policy period of 03/30/2008 to 03/30/2009.  These will be referred to as the "Company Policies."   Indian Harbor Insurance Company ("Indian Harbor") issued the underlying policy no. ELI103861-08 for the same policy period (the "Underlying Policy");

2.  The relationship between primary and excess professional liability policies in general and between the Underlying Policy and the Company Policies in particular;

3.  Excess insurers' payment obligations in general and Houston Casualty's and National Specialty's payment obligations in particular;

4.  Notice under professional liability insurance policies in general and in the Underlying Policy and the Company Policies in particular;

5.  Notice by insurance companies as insureds of claims under professional liability policies in general and Direct General's notices of **Claims**[1] under the Underlying Policy and the Company Policies in particular; and

6.  Application of a related-claims provision under professional liability policies in general and the **Related Claims** provision under the Underlying Policy and Company Policies in particular.

---

[1]     (Bold faced terms are defined in the Underlying Policy.)

I am being compensated $300.00 per hour for my services.  That is my standard rate for serving as an expert witness.

Attached as Exhibits A through E to this report are the summary of my qualifications (Exhibit A), a copy of my current CV (Exhibit B), a list of my industry-related publications in the past 10 years (Exhibit C), a list of matters in which I have written an opinion and/or testified as an expert in the past 4 years (Exhibit D), and a list of the materials I have considered in connection with forming the opinions expressed herein (Exhibit E).

As outlined in the summary of my qualifications (Exhibit A) and in my CV (Exhibit B), I have substantial experience in the insurance industry, particularly with respect to the development, intent, and interpretation of Insurance Services Office, Inc. ("ISO") and individual company policy forms and endorsements (including professional liability coverage forms).  I also have significant experience in the placement of insurance with insurance companies and the policy forms and endorsements they may issue to provide coverage, the provisions in those policy forms and endorsements – including notice provisions – and in the claims handling process under those policies.  I also am knowledgeable regarding the custom and practice in the P&C insurance industry and the standards by which insurers, adjusters, administrators, and agents should comport themselves to be in compliance with industry custom and practice.  I also have practical claims handling experience through:

1. Working with claims as the underwriter for Government Mutual Insurance Company;

2. Handling The Home's responses to questions raised by insurance regulators during market conduct claims examinations;

3. Being responsible for the settlement of claims and approving all claims in excess of $100,000 while serving as the New Hampshire Insurance Department's Supervisor of The Home Insurance Company was in Run-Off;

4. Participating in claims department meetings to review and discuss handling of claims while serving as the New Hampshire Insurance Department Supervisor of The Home Insurance Company was in Run-Off and later while The Home Insurance Company was in liquidation; and

5. Reviewing individual claims issues and providing expert opinions as an expert witness.

As part of my preparations in this case, I have reviewed a significant amount of material, most notably the:

- Policy forms issued by Indian Harbor and the Companies to Direct General;

- Claims arising out of Direct General's interpretation of Florida law;

- The notices provided directly by Direct General or on its behalf by a third party to the Companies; and

- Individual claims from insureds against Direct General seeking payments under Florida's personal injury protection ("PIP") law.

## SUMMARY OF OPINIONS

Based on my education, training, and knowledge gained through years of experience in the P&C insurance industry, along with my review of the information listed on Exhibit E, I have developed the following opinions to a high degree of professional certainty:

1. Under P&C industry custom and practice, commercial insureds often purchase professional liability insurance from more than one company. An insurance program typically consists of a primary policy that will first respond to claims against the insured. Because each insurance company, due to financial conditions and limitations, may not be able to provide the limits of insurance desired, other insurance companies may provide a layer of insurance above the primary policy's limit of insurance (often referred to as the "limit of liability" – the most the insurance company will be liable for payment). The custom in the industry is to call these excess limits "layers" because they are "layered" above the primary limit, and to call the primary policy the "underlying policy." In this case, Indian Harbor issued the Underlying Policy and Houston Casualty and National Specialty issued the excess policies (the "Company Policies").

2. The company or companies writing layers above the primary (or underlying) policy may determine the type and extent of coverage they will provide. Under the custom and practice of the industry, excess insurance policies follow the fortunes of the underlying policy unless the excess policies are not true follow form policies. If the excess policies follow the fortunes of the primary policy, they rely on the underlying policy's insuring agreement, exclusions, and conditions. Excess policies that do not follow the fortunes of the underlying policy use their own policy provisions, *e.g.*, their own insuring agreement, exclusions, and conditions. The Company Policies are true "follow form" excess coverage policies that "follow form" to the coverage provided by the Underlying Policy. The Companies chose to have their Company Policies rely on the fortunes of the Underlying Policy and did not utilize their own insuring agreement, exclusions, and conditions.

3. Under industry custom and practice, following form excess insurers will pay a claim paid by the underlying insurer if the claim reaches the excess policies' limits. Because the Underlying Policy has been exhausted by payments by Indian Harbor and the Company Policies relied on the Underlying Policy to determine coverage, under common industry practices the Companies would be expected to pay up to their limits of liability. Consistent with that custom and practice, the Companies should pay the available limits under the Company Policies for the claim at issue here because the Underlying Policy exhausted its available limits for that claim.

4.  Under industry custom and practice, professional liability insurance policies often require notice only after management becomes aware of a claim. Consistent with this industry custom and practice, the Underlying Policies and the follow form Company Policies do not require notice until Direct General's risk manager or general counsel becomes aware of the claim (or claims).   Consistent with this industry custom and practice, Direct General notified the Companies of a June 19, 2008 Class Action (*Advantage Open MRI v. Direct General Insurance Company* – Case No. 08-CC-20862) (the "Class Action Claim"), when it came to the attention of Direct General's General Counsel.

5.  Notice of claims under professional liability policies differs from that made under general personal or commercial lines policies, particularly when the insured is itself an insurance company.   Direct General's handling and notice of demands and lawsuits asserted against it is customary and usual in the P&C insurance industry.

6.  Under industry custom and practice, related claims are not separately dated or treated for the application of professional liability coverage, but rather grouped together for the application of the policy coverage.  All related claims relate to the first claim that comes to the attention of the designated individuals under the notice provision" (the "Trigger Claim"), even if certain of those related claims are asserted against the insured before or after the Trigger Claim.  Here, the Class Action Claim is the Trigger Claim.  The Trigger Claim arises out of one incident, Direct General's alleged error or omission in its interpretation of the Florida PIP statute.  Individual demands and lawsuits alleging a similar **Wrongful Act** are **Related Claims** to the Class Action Claim.

## DETAILED DISCUSSION OF OPINIONS

A.   **THE PRIMARY POLICY**

1.   As noted in the Summary of Opinions above, it is common in the P&C industry for insureds to purchase insurance from more than one company. This is not exclusive of professional liability insurance but applies to many other types of insurance.   In this case, Direct General desired higher professional liability insurance limits than what would have would have been available from an individual company.   The first set of limits was purchased from Indian Harbor as the primary policy.   This, since excess limits were also purchased, is the Underlying Policy.

2.   The Underlying Policy issued by Indian Harbor is a professional liability policy.   It is a claims-made policy that provides coverage for alleged **Wrongful Acts** of the **Insured** as long as a **Claim** is first made during the policy period or, if the policy is terminated, during a discovery period either automatically provided by the policy or one elected to be purchased by the **Insured**.   The policy does not apply only to **Wrongful Acts** that occur during the policy period.   A claims-made policy can (and should) apply to **Wrongful Acts** that may occur prior to the current claims-made policy's policy period, as long as they occur after any applicable retroactive date. The retroactive date for the Underlying Policy is September 28, 1983. That means a **Wrongful Act** that occurred anytime after September 28, 1983, but prior to the termination date of the policy, could be covered as long as the claim were first made prior to the termination date (or during a discovery period if one applied) of the policy then in effect.   (Note that some claims-made policies term the "discovery period" as the "extended reporting period.")   Under the terms of the Underlying Policy, **Claims** were first made during the policy period.   In this case, the Underlying Policy applies and Indian Harbor has exhausted its limit of liability in the payment of **Claims** to Direct General.

B.   **THE EXCESS POLICIES**

1.   Direct General purchased higher limits than provided by Indian Harbor in the Underlying Policy.   Direct General purchased the Company Policies from Houston Casualty and National Specialty.

2.   The Company Policies are termed "follow form" policies in the industry. While some "follow form" policies contain their own insuring agreement, exclusions, and conditions, the Company Policies here follow the "terms, definitions, conditions, exclusions and limitations of the Followed Policy." There is a caveat in the Company Policies that the policy may contain other provisions; however, in this case, the Company Policies actually have few other provisions.   The "other" provisions in the Company Policies relate to special definitions in the "Followed Policy" and no separate

exclusions apply.  While the Companies had the right and ability to add to the Underlying Policy, to use their own policy provisions, or to modify the Underlying Policy, they did not do so.  Thus, these "follow form" policies are designed to apply, and should be interpreted as applying, in the same manner as the Underlying Policy.  That is, they follow the fortunes of the Underlying Policy.  Under common industry custom and practice, that means that if the Underlying Policy applies, then the Company Policies apply, provided that the Underlying Policy's limit of insurance is exhausted.

3.      The Underlying Policy exhausted its limits in the payment of **Claims** of Direct General under the Policy for **Wrongful Acts** for **Claims** first made during the March 28, 2008 through March 28, 2009 policy period. Because the Company Policies do not contain any changes to the **Insuring Agreement** in the Underlying Policy nor any special exclusions, under normal industry custom and practice, they follow the fortunes of the Underlying Policy.  Thus, it would be expected that those Policies would follow the fortunes of the Underlying Policy to pay **Claims** up to their limits of liability.

## C.     NOTICES PROVIDED

1.      The Notice Provision of the Underlying Policy is slightly different than a normal notice provision contained in a professional liability or commercial lines policy, in that the Notice Provision is amended (by Endorsement 8-14 03 06) to limit its application.  Rather than state that the company (the **Insured**) must give the insurer notice of the **Claim** as soon as reasonably practicable, the endorsement adds language to state that the Notice Provision applies only when the risk manager or the general counsel becomes aware of any **Claim** that may be made under the (professional liability – underlying) policy.

The Underlying Policy defines **Claim** as:

(1) Any civil proceeding in a court of law or equity, including any mediation or other alternative dispute resolution ordered or sponsored by such court;

(2) Any criminal proceeding in a court of law;

(3) Any administrative or regulatory proceeding, commenced by the filing of a notice of charges, formal investigative order or similar document;

(4) Any arbitration proceeding initiated or compelled pursuant to a written arbitration agreement; and

(5) A written demand or notice to an **Insured** indicating that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act**."

2.    In a professional liability policy, the notice of claim is different from a notice of claim under a normal personal lines or commercial lines policy. For example, Direct General normally received demands under its personal auto policies requesting payment or reimbursement for the payment of losses insured under those policies – for example, property damage, liability, personal injury protection, etc. Those types of demands, by themselves, would not be sufficient to trigger or require a notice under the professional liability policy. A notice of claim under a professional liability policy is one where a wrongful act, as defined in the policy, is alleged.

The Underlying Policy defines **Wrongful Act** as:

"(1) Any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary or other duty committed by an **Insured** in rendering, or in the failing to render **Professional Services**.

(2) Any actual or alleged libel, slander, or oral or written publication of defamatory or disparaging material committed by an **Insured** in rendering **Professional Services**;

(3) Any actual or alleged act, error or omission of an **Outside Service Provider** for which an **Insured** is alleged to be liable, but only in connection with the **Outside Service Provider's** rendering of, or failure to render, **Professional Services** for or on behalf of the **Insurance Company**; and

(4) Any actual or alleged act, error or omission of an **Independent Insurance Agent** for which the **Insurance Company** is alleged to be liable, but only in connection with the **Independent Insurance Agent's** rendering of, or failure to render, **Professional Services** for or on behalf of the **Insurance Company**."

3.    The claims that would be reported under a professional liability policy issued to an insurance company are quite different from those that are normally reported under a policy issued to other types of businesses, because insurance companies as policyholders deal with demands and lawsuits on a daily basis as part of their business. Rather than report every demand and lawsuit to the professional liability insurer, these policies typically require senior management to have knowledge of a claim alleging a wrongful act before requiring notice to the professional liability insurer. The foregoing knowledge requirement gives context to the Underlying Policy's Notice Provision, which requires knowledge of the risk manager or general counsel. This Notice Provision follows normal industry custom and practice under professional liability insurance. The insurance carriers providing professional liability coverage do not need notice of any of the normal claims of an insurance company, but rather

notice of a claim alleging a wrongful act as defined in the professional liability policy.  As is common industry practice, the determination of a wrongful act would be the responsibility of a senior officer of the insured – and as defined in the Notice Provision amendment to the Underlying Policy, the risk manager or general counsel.  Direct General does not have a risk manager.  Therefore, the proper individual who provides notice of a possible Wrongful Act – thereby triggering coverage under the Underlying Policy and Company Policies – would be Direct General's General Counsel.

Accordingly, it would have been impossible to determine that a **Claim** (or notice of **Claim**) under the Underlying Policy and Company Policies should have been submitted until Direct General's General Counsel became aware of the Class Action Claim. Here, Direct General provided proper notice of the Class Action Claim – which would qualify as an alleged **Wrongful Act** – to Indian Harbor and the Companies during the policy periods.  This was the Trigger Claim, and because it was properly made during the policy period, coverage applies.

a. National Specialty contends that the **Claim** may not be payable because of an exclusion in the Underlying Policy.  Because Indian Harbor has exhausted its limit of liability in the payment of this **Claim**, Houston Casualty and National Specialty must follow the fortunes of the Underlying Policy and pay the **Claim** when it reaches their Policies' limits of liability.

b. If Houston Casualty and/or National Specialty had desired to add insuring agreement, exclusions, and conditions, they had the opportunity to build those provisions into the policies they issued (upon acceptance by the insured).  But, the Companies did not do so and thus, under common industry practice and custom, they are subject to the fortunes of the Underlying Policy as agreed upon in the policies they issued.

c. The Company Policies do not modify the endorsement to the Underlying Policy's amendment of the Notice Provision.  The Houston Casualty policy provides that if the **Insured** gives notice to the underlying insurer, the **Insured** must provide notice to its excess insurer "in the same means as required by the terms and conditions of the primary policy."  The National Specialty policy has no provisions addressing notice of claim other than specifying, on the Declarations, to whom notice should be sent.  When Direct General (directly or via an entity on its behalf) provided notice of the Class Action Claim to Indian Harbor pursuant to the Underlying Policy, it provided appropriate notice to Houston Casualty and National Specialty by sending them copies of that notice.

d. Over the course of my career, I have developed and reviewed excess policies that "follow form" and rely on the provisions of underlying policies, as well as excess policies that are subject to their own policy provisions.

Those excess policies contain their own insuring agreement, exclusions, and conditions, and, if written as claims-made policies, their own retroactive dates and extended reporting (discovery) provisions. In this case, because the Company Policies do not include their own exhaustive provisions, but rather rely on the provisions of the Underlying Policy, they can only follow the fortunes of the Underlying Policy, and they cannot raise issues on policy language they did not write or issue.

    **e.** To the extent, therefore, that **Claim** notices were sent to and accepted by Indian Harbor and Indian Harbor paid its remaining policy limits, it would be common practice and procedure to have those notices apply to the "follow form" excess policies issued by Houston Casualty and National Specialty and for those insurers to pay their policy limits provided that Direct General's damages reached those limits.

**D.    RELATED CLAIMS**

    **1.** The Underlying Policy defines **Related Claims** as follows:

        "'**Related Claims**' means all **Claims** for **Wrongful Acts** based on or directly or indirectly arising out of or resulting from the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events."

    **2.** As noted in C. above, claims under a professional liability policy are different than those claims that may be made under a normal personal or commercial primary policy. Many claims could be brought under a primary personal or commercial policy before any one individual within a company determined that a wrongful act under a professional liability policy may be alleged. Under normal claims handling within an insurance company (as the insured), many personnel may handle claims – for example, one set of claims personnel may handle all personal property claims under a homeowners or dwelling policy while another set of several personnel may handle all personal injury protection claims. The claims may be for similar circumstances – *e.g.*, fire losses or auto accidents, but may not be considered a wrongful act under a professional liability policy until a series of claims is brought to the attention of a senior professional. In this case, the Class Action Suit alleging error in interpreting the Florida statute regarding the amount of payment for certain personal injury claims was brought to the attention of the General Counsel. Notice of that **Claim** can need only be provided when, as specified in the Endorsement attached to the Indian Harbor Policy, the risk manager or general counsel of the company learns of that possible error or omission. Then, according to the definition of **Related Claims**, all **Claims** arising out of that error are attributed to the date when the claim is first made by the **Insured** – Direct General.

Page 10 of 14

a. An argument was made that "pre-policy" and/or "post-policy" demands are not covered.  The pre-policy demands do not qualify as **Claims** as defined under the professional liability policy, but are normal claims associated with the personal injury protection coverage under the personal auto policies issued by Direct General.  Individual demands and lawsuits asserted against Direct General after inception of the policy period and before or after the Class Action suit that assert allegations similar to the Class Action Suit are **Related Claims** that relate to the Trigger Claim – the Class Action Suit.

b. Neither of the Company Policies amends the Underlying Policy's definition of **Claim** or **Related Claims**.  Thus, the terms of the Underlying Policy apply.

c. The Underlying Policy has exhausted its limit of liability in payments to or for Direct General.  Thus, the coverage, as is common in the industry for follow form coverage, should be triggered, and the Company Policies issued apply up to their respective limits of liability.

3. The treatment of **Related Claims** as proffered by Direct General, in my opinion, follows the common practice of the industry.  While The Home was an active company, the Specialty Insurance Division wrote over $500 million each year in professional liability insurance.  The large majority of the coverage was on claims-made policies that contained related-claims provisions.  I was the drafter of many of those provisions while I was responsible for the product development of The Home's independent insurance products.  During the course of my approval of claims against The Home in Run-Off, I approved the same treatment of related claims as Direct General proposes.  A significant and common issue when dealing with claims as defined in this case, is when a senior officer (in this case, the General Counsel) determines that a claim has been satisfied and notice is to be provided to the professional liability insurer.  When that notice is provided, all related claims – either made prior to or after the date of that notice – must be joined with the claim for which coverage is made.  That is, they are all related claims.

## E.  INDUSTRY STANDARDS

1. Under the personal auto insurance policies issued by Direct General, a claim is a demand for benefits provided under the issued insurance policy, *e.g.*, a request to pay medical expenses caused by an auto accident or loss of income because of an auto accident.  Thus, it is necessary to refer to the defined terms in a policy to determine the application of a policy.

2. It is common in the industry, in the case of a professional liability policy issued to an insurance company, to limit required notice provisions to **Claims** as defined in the policy. If a policy did not afford a special

definition or meaning to a term, the normal dictionary definition would apply.  Otherwise, the professional liability insurer could be swamped with notices of **Claims** because of normal claims under policies issued by the primary insurer.

3.       Another standard requirement in the industry is, when a policy is issued by a non-admitted insurer in a state, to provide a statement on the Declarations that the insurer is not an authorized insurer in the state and thus coverage for the insolvency of the insurer would not be provided, should that event occur, by a state guaranty fund.  The Indian Harbor policy contains the following note on the Declarations:

"This insurance contract is with an insurer not licensed to transact business in this state and is issued and delivered as a surplus line coverage pursuant to the Tennessee Insurance Statutes."

Neither the Houston Casualty policy nor the National Specialty policy contain similar language on their Declarations.  Thus, neither is in compliance with Tennessee law.

## SUMMARY

Based on my education, training, and knowledge gained through years of experience in the P&C insurance industry, along with my review of the information listed, Direct General made valid **Claims** for **Wrongful Acts** under the Underlying Policy issued by Indian Harbor.  The Underlying Policy has exhausted its limit of liability in the payment of **Claims** for **Wrongful Acts**.  Likewise, the Company Policies issued by Houston Casualty and National Specialty should afford coverage, since they do not amend the **Insuring Agreement** of the Underlying Policy or add any specific exclusions to the Underlying Policy, nor do they amend the Notice Provision of the Underlying Policy.

The Company Policies issued by Houston Casualty and National Specialty are "follow form" policies, and therefore should follow the fortunes of the Underlying Policy and afford coverage up to the insured limits of liability.

As noted in Mr. Michael K. Rappaport's (of Ironshore handling claims for National Specialty) October 17, 2012 letter to Jon Dowell of Direct General, "The Policy covers Claims first made during the policy period of March 30, 2008 to March 30, 2009.  Subject to its terms and conditions, the Policy follows the form of the primary policy issued by Indian Harbor."  Proper notice was made, and determined to be made, in the Underlying Policy.  Therefore, proper notice was also made in the Company Policies.  No exclusion applies.  A Trigger Claim was made for a **Wrongful Act**, which is covered under the Underlying Policy and Company Policies.  All **Related Claims** fall forward or back to the date of the Trigger Claim.

I believe that under the terms and conditions of the policies issued by Houston Casualty and National Specialty as "follow form" policies, Direct General has provided proper notice of **Wrongful Acts** as **Claims** first made under the Company Policies, and therefore coverage applies.  Houston Casualty and National Specialty follow the fortunes of the Underlying Policy and, following common industry practices, Houston Casualty and National Specialty are liable to Direct General up to the limits of their liability as shown on their follow form policies.

[SIGNATURE ON NEXT PAGE]

Michael L. Averill, CPCU, MBA
92 McIntosh Lane
Bedford, New Hampshire 03110

January 2, 2015

**EXHIBIT A**

**Michael L. Averill, CPCU, MBA**

**Michael L. Averill Consulting, LLC**

**Qualifications**

Following is a recap of my experience in the Property & Casualty (P&C) business which qualifies me to give the opinions expressed within my report.

**Insurance Services Office, Inc. ("ISO")**

I worked for the Insurance Services Office, Inc. ("ISO") from 1971 to 1987.

My insurance career began at ISO in the Personal Auto Division.  My initial responsibilities Included developing endorsements to modify policy language to comply with state laws and regulations and to provide optional means to broaden or restrict policy provisions.  While I was in the Personal Auto Division I became involved in the first project in the P&C business to simply policy language — the HO (Homeowners) 76 Program.

Later I chaired the drafting Committee which developed the first simplified Personal Auto Policy.  I was the ISO representative on that project charged with:

- Drafting the policy language and reviewing it with a special Ad Hoc Committee;

- Finalizing the policy language and that of all endorsements to be used with the simplified policy;

- Obtaining approval of the necessary ISO Committees;

- Developing and  making the appropriate rates, rules, forms, and endorsement filings with state regulators and testifying at regulatory hearings;

- Undertaking the appropriate education of company personnel employed by ISO affiliates and agents and regulators.

I also had direct hands-on experience drafting or revisions to, ISO's rules for compliance with state laws and regulations.  This included working with state regulators on the Implementation of personal injury protection provisions as well as the introduction of uninsured and underinsured motorists coverage and the procedures necessary to implement those laws and regulations.

While in the Personal Auto Division I was asked to work on Homeowners (Personal Property) forms and endorsements as well, including the DP 3, Ed. 1 77.  My responsibility was to make sure language was consistent among the ISO simplified policies to the extent intent was similar or the same as well as to make sure the policy

language carried out the intent of coverage. Thus I was very familiar with the application of the DP 3 Ed. 1 77 that was used to afford coverage to Chase mortgage holders provided insurance.

In 1980 I was promoted to Assistant Manager of the Commercial Property Division at ISO. In that position I was responsible for the development and implementation of all mono-line and multi-line rating, loss costs, rules, and forms (policy forms and endorsements).

In January, 1983 I was promoted to Manager of the Commercial General Liability ("CGL") Division and in April, 1983 I was also given responsibility for the Commercial Auto Division. As the manager of the entire Commercial Casualty Division I was responsible for the development and implementation of all rating, loss costs, rules and forms (policy forms and endorsements) for general liability, professional liability, and commercial auto. I also led the internal committee developing the commercial lines simplification program.

I was also responsible for the development of the ISO Claims Made policy and its implementation and the implementation of the entire ISO Commercial Lines Simplification Project. That Project was the largest undertaking in the P&C insurance field ever completed. It involved the rewrite of all of the commercial lines insurance coverage forms and endorsements serviced by ISO. In included the rewrite of all ISO manuals and a revised classification plan. ISO has over 1,200 participating companies and is the largest insurance service organization in the world. As part of the entire project I was charged with the writing of the claims made version of the commercial general liability policy as well as ensuring that provisions in that policy which applied to other commercial lines coverage forms all used the same language when the intent was the same. That included all Notice provisions as well as coverage grants, exclusions, conditions and endorsement modifications of the general contracts.

During my policy and endorsement development work at ISO I discussed all aspects of policy administration, interpretation, and adjustment with company attorneys, underwriters, operations staff and claims personnel.

**The Home Insurance Companies ("The Home")**

In June 1987, I left ISO and became a Vice President of The Home Insurance Companies. I started the Government and industry Relations Department for The Home, and my initial responsibilities included overseeing all state filings made by The Home as well as its relationships with all state insurance regulators and state and federal legislators. I was an officer of all seven (7) of The Home's property and casualty insurance companies.

I also began the Product Development unit of The Home which was responsible for the development of The Home's independent policy forms and endorsements as well as modifications to ISO's "standard" products that were used by The Home (which was an

Page 2 of 6

ISO participating company).  This unit was also responsible for the maintenance of The Home's independent products in compliance with law and regulation.

My work at The Home required me to be directly involved with other departments in The Home's operations.  This included liaison with:

- Underwriting — Discussing policy interpretation, underwriting issues, auditing, tailoring policy language for individual accounts, and use of independent and ISO forms and endorsements.

- Operations — In policy issuance, rating, retention guidelines, and compliance.

- Rating and Statistical — Ensuring The Home's rate filings were consistent, accurate, and complied with state regulatory requirements.

- Agency Operations — In review and development of agency contracts and in The Home's relationships with agents and brokers.  I also represented The Home on the Independent Insurance Agents of America's Enhancement to Agency Values Task Force — a multi-year project designed to improve the agency system in the United States.

- Working with representatives of marketing and underwriting I assisted in the development of program operations for The Home.  This involved developing the program materials used by major managing general agents of The Home and major producers for The Home.  Program materials included specialized rates, rules and forms as well contracts for managing general agents, underwriting guidelines, and auditing of managing general agents for compliance with underwriting guidelines.  With The Home's major producers, programs were developed for large" accounts - accounts with premiums exceeding $500,000.  These types of accounts included multi state risks — involving services, operations, products, and activities.  Accounts could include transportation risks, franchises, pharmaceutical companies, public entities, and others.  Another area of The Home on which I focused was the Specialty Underwriting Department.  This Department included all professional liability policies and all excess and surplus lines policies.  The premium for the Specialty Underwriting Department exceeded $500,000,000 annually.  My work in this area included the development of policy language to ensure common policy language was used where the intent was the same among the various specialty markets.

- Claims — Ensuring accurate retention of policies and endorsements and claims practices.  I was the liaison between Home staff and regulatory staff on financial, market conduct and claims exams.  With that responsibility came the requirement that I understand all issues that could arise as well as to draft and finalize all responses to regulatory questions.

- Accounting — Acting as the liaison on regulatory financial examinations and involvement on all residual market costs.

- Legal — Responsible for work products of legal staff assigned to Government Relations on compliance activities, licensing projects, and related issues.

- Reinsurance — Reviewing NAIC and legislative activities for impact on the company.

- Complaints   preparing, reviewing, and submission of responses to all complaints raised by Home policyholders with state Insurance Departments and review of all complaints raised by Home policyholders directly with The Home.

As one of the three individuals at The Home who was an Officer of all seven (7) Hopme companies I represented The Home in many different functions. I was on the Board of Directors of the International Insurance Council. I represented The Home's international department which provided liability and property coverages worldwide. I attended quarterly meetings of members of the Council and international meetings of international regulators at the quarterly meetings of the National Association of Insurance Commissioners. Thus I am familiar with international regulation and standards as well as insurer and regulatory international staff. I was also on the Board of Directors of seven (7) different state insurance associations maintaining The Home's regulatory presence in those states.

**Syndicated Services Company, Inc, ("SSC")**

In 1994, I joined SSC as a Vice President. SSC serviced Lloyd's of London admitted program business in the United States. In the six years following my arrival, the Senior team of which I was a part grew that business to over $150M. All of the business written through SSC was placed by managing general agencies. Prior to taking a managing general agent to London for Lloyd's consideration, I was responsible for all of the background checks on the principals of the managing general agency, the review of all historical loss experience, and presentation manuals of a managing general agent's current program material for review by Lloyd's underwriters.

At SSC I was responsible for the development, implementation, and maintenance of all independent products tailored to the programs serviced by SSC. That included all policy forms and endorsements for all the commercial lines programs serviced by SSC. This included using ISO forms and endorsements as their base.

In addition, I was responsible for review and implementation of underwriting guidelines with the managing general agents. That included the detailed provisions which a managing general agent was expected to understand and implement I was responsible for the audits of the managing general agents — which entailed both in-house and on-site reviews of compliance with underwriting guidelines, policy issuance, and claims handling procedures.

Programs written through SSC, while I was employed at the company, included the following countrywide programs:

| | |
|---|---|
| School Leaders E&O | Black Cars (in New York City only) |
| Volunteer Fire Departments | Trucking Operations |
| Social Service Agencies | Sports and Entertainment |

Many of these programs included commercial auto coverage for commercial driving operations including buses, vans, trucks, and other commercial vehicles.

I visited London several times.  During these visits I gave presentations to members of over two dozen Lloyd's syndicates on the US regulatory environment and on ISO programs and practices.  I assisted in the development of the 100 percent reinsurance contracts for SSC programs including the insertion and explanation of all ISO forms, endorsements, rules, rating programs, and manuals that would be used for a program.

I am very familiar with the Lloyd's policy language, the participation of Lloyd's syndicates in a reinsurance program, and in the language and operation of the reinsurance contract.

I was also responsible as the liaison between state regulators and the insurance carriers SSC used.  That included preparing answers and submitting them to both the insurance carrier for approval as well as the subsequent response to an insurance regulator.  Questions included, but were not limited to, those on rating, policy issuance and claims handling.

**New Hampshire Insurance Department**

In 2001, I became the Assistant Insurance Commissioner for the State of New Hampshire. My responsibilities included oversight of the P&C section of the Department including review and action on all rules, policy forms, and endorsement filings by New Hampshire admitted insurers.  In addition, during a vacancy in the P&C actuary position, I acted as the Department's P&C Actuary and was responsible for the review and action on all rate filings.  I was responsible for company compliance with all New Hampshire Laws and Regulations.  This was administered through market conduct examination of companies — either on a regularly scheduled basis or on a special basis because of complaints by consumers or fellow regulators.  I would oversee the market conduct examination process or, at times, become personally involved in the market conduct examination effort.

At the end of my first year as Assistant Insurance Commissioner I was asked by the Commissioner to take the position as Supervisor of The Home Insurance Company in run-off, under the Department's Order of Supervision, I took that position as an independent consultant and was responsible for the supervision of the company (Risk Enterprise Management) and its 265 employees assigned to manage The Home's financials, its reinsurance, and to run off all claims against The Home Insurance Companies.

Page 5 of 6

I was responsible for the review of all claims payments (settlements and judgments) as well as all established reserves for claims against any of The Home's seven (7) companies.  I was provided authority, under the New Hampshire Order of Supervision, to approve any claims payments in excess of $150,000.  I was involved in the weekly meetings to review outstanding claims against The Home companies.

After The Home was liquidated I was also responsible for implementing the proof of claims system for all outstanding and new claims against The Home.

**Government Entities Mutual Insurance Company ("GEM")**

I was the initial underwriter for, and assisted in the organization of, a startup company, Government Entities Mutual Insurance Company. GEM writes insurance for public entities in excess of self-insured retentions. While the underwriter for GEM I was involved with the review, underwriting and pricing of large public auto accounts.  For example, large city public transportation accounts including public buses, public school transportation, and city owned/used vehicles.

**Consultant**

The Mutual Service Organization ("MSO"), another industry service organization, has retained me to develop additional programs as a service to their clients. This has included specialized commercial programs as well as personal property programs.

I have and continue to modify insurer programs, for many clients.  In many cases these modified programs use ISO standard loss costs, rules, policy forms, and endorsements as their base.  For one multi state client I revised and updated all of their Commercial Policies, Endorsements and Manuals (Businessowners, Commercial Auto, Commercial General Liability, Commercial Property and Commercial Umbrella) and Personal Lines Policies, Endorsements, and Manuals (Homeowners, Dwelling, Personal Auto, and Personal Umbrella) in a company wide program to implement a new policy administration system and to use current ISO program material.  For another multi state client I developed specialized coverages (rating and forms) for use in a specialized market.    Yet, for another multi state client I developed independent forms, endorsements, and manuals to be used for insureds who normally would have been insured under the standard (ISO) products of competitors.

I am very familiar with the ISO pre simplified and simplified personal lines and commercial lines programs (loss costs, rules, rating programs, policy forms and endorsements.  I continue to monitor any and all changes proposed and/or implemented by ISO.

 I have also been an expert witness for several clients including policy interpretation and administration and have assisted clients on regulatory compliance activities