## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 14-20050-Civ-COOKE/TORRES

DIRECT GENERAL
INSURANCE COMPANY,

       Plaintiff,

v.

HOUSTON CASUALTY COMPANY,
and NATIONAL SPECIALTY
INSURANCE COMPANY,

       Defendants.

_____/

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As the African proverb states, when two elephants fight, it is the grass that gets trampled. Both sides in this action are large insurance companies that are unable to agree on the terms governing the insurance policy that binds them. Despite their sophistication in the insurance field, neither accedes to the other's interpretation of the term, "Related Claims." The resulting dust up involves class actions, individual lawsuits, and thousands upon thousands of PIP claims. Much litigation grass has been trampled over the course of five years.

Before me now is the fully briefed Defendants' Joint Motion for Summary Judgment (ECF Nos. 119, 120, 135, 136, 139, 141, 160, 185, 187) ("Defendants' Motion"). The Court held a hearing on the parties' motions for summary judgment on June 10, 2015. I have considered the motion, response, reply, supplemental briefing[1], record, and the relevant legal authorities. For the reasons provided herein, Defendants' Motion is granted.

---

[1] I permitted supplemental briefing following the June 10, 2015 hearing to afford Plaintiff the opportunity to address the narrow issue of the Indian Harbor settlement. (ECF No. 195 at 81:18-20). I have considered the supplemental briefing only to the extent that it addresses this narrow issue.

## I.   UNDISPUTED FACTS

Plaintiff Direct General Insurance Company ("Direct General") is a Tennessee insurance company that issues automobile insurance policies that provide personal injury protection ("PIP") benefits under Florida law. (ECF No. 120 ("Defs.' SOF") at ¶ 13). Since 1971, Florida has required automobile insurers to provide a PIP no-fault benefit. (ECF No. 133 ("Pl.'s Resp. SOF") at ¶ 53).

Direct General is an insured under a program of professional liability insurance issued to its parent company, Elara Holdings, Inc., for the policy period March 30, 2008 to March 30, 2009. (Defs.' SOF at ¶ 1). The insurance program consists of (a) a primary policy issued by Indian Harbor Insurance Company ("Indian Harbor") with a $10 million limit of liability and $1 million per Claim retention;[2] (b) a first excess policy issued by Defendant Houston Casualty Company ("Houston Casualty") with an additional $10 million limit of liability; and (c) a second excess policy issued by National Specialty Insurance Company ("National Specialty") that provides an additional $10 million limit of liability (collectively, the "2008-2009 Policies"). (Id. at ¶ 2). The excess policies issued by Houston Casualty and National Specialty (collectively, the "Excess Carriers") "follow form" to the primary policy – the Indian Harbor Policy (the "Followed Policy") – meaning that they contain the same terms and conditions set forth in the primary policy unless otherwise provided therein. (Id. at ¶ 3).[3]

### Policy Terms

The Policy states, in relevant part, "[t]he Insurer will pay on behalf of the **Insured Loss** from **Claims** first made against the **Insured** during the **Policy Period**…for **Wrongful Acts** first committed on or after the Retroactive Date [September 28, 1983]." (Pl.'s Resp. SOF at ¶¶ 4, 44).[4]

---

[2] Indian Harbor was a defendant herein, but it has settled with Direct General. (ECF No. 75).

[3] The Followed Policy and the excess policies shall be referred to as the "Policy."

[4] Bold text represents defined Policy terms.

The Policy further states that "[a]ll **Related Claims** will be treated as a single **Claim** made when the earliest such **Related Claims** was first made or when the earliest of such **Related Claims** is treated as having been made…, whichever is earlier." (Pl.'s Resp. SOF at ¶ 5). The term **Related Claims** includes "all **Claims** for **Wrongful Acts** based on or directly or indirectly arising out of or resulting from the same or related…series of facts, circumstances, situations, transactions, or events." (Defs.' SOF at ¶ 6). The term **Claim** includes "any civil proceeding," and any "written demand or notice to an **Insured** indicating that a person or entity intends to hold an Insured responsible for a **Wrongful Act**." (*Id.* at ¶ 7; Pl's Resp. SOF at ¶ 46). The term **Wrongful Act** includes "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary duty or other duty committed by an **Insured** in rendering, or in failing to render, **Professional Services**." (Defs.' SOF at ¶ 8).

The term **Professional Services** is defined as "services performed by the **Insurance Company**…for a policyholder, customer or client…, which, alone or in combination with other services, are performed for monetary consideration pursuant to a policy of insurance or other **Express Contract or Agreement**." (Pl.'s Resp. SOF at ¶ 9). The term **Loss** is defined as "damages, judgments, awards, settlements, and the **Defense Expenses** which an Insured is legally obligated to pay as a result of a **Claim**." (*Id.* at ¶¶ 10, 45). "**Defense Expenses**" means "reasonable legal fees and expenses incurred by or on behalf of any Insured in the defense or appeal of any **Claim**." (Pl.'s Resp. SOF at ¶ 50). The term **Loss** excludes "penalties imposed by law," "matters which are uninsurable under the law pursuant to which this Policy shall be construed" and "any amount due under any contract or policy of insurance…underwritten [or] issued…by the Insurance Company." (Defs.' SOF at ¶ 10).

The Policy states, "no Defense Expenses may be incurred and no settlement of any Claim may be made without the Insurer's consent, such consent not to be unreasonably withheld." (Defs.' SOF at ¶ 11). The policies provide that, "the **Insured** may settle any **Claim** without the Insurer's prior written consent if the total

3

Loss resulting from a claim does not exceed fifty (50%) of the amount of the applicable retention…provided, however, the **Insured** must promptly advise the Insurer of any such settlement and provide information in connection therewith that the Insurer may request." (*Id.* at ¶ 12; Pl.'s Resp. SOF at ¶ 12). The Followed Policy permits the Insurer to participate in settlement negotiations "[i]f the **Insured** reasonably expects that the **Loss** resulting from any **Claim** will exceed fifty percent (50%) of the applicable retention…." (Pl.'s Resp. SOF at ¶ 12). An endorsement to the Policy provides that:

> As a condition precedent to any right to payment in respect of any **Claim**, the Insured must give the Insurer written notice of any such **Claim**, with full details, as soon as practicable after the **Claim** is first made and the risk manager or general counsel of the **Insurance Company** first becomes aware of such **Claim**, but in no event later than sixty (60) days after the end of the **Policy Period**.

(*Id.* at ¶ 52). Direct General does not have a risk manager, so this endorsement is triggered only when its General Counsel becomes aware of a **Claim**. (*Id.*).

### Florida PIP Law

In 2003, one of multiple revisions to the Florida PIP statute (the "PIP Statute") included a "sunset" clause which provided that effective October 1, 2007, the PIP Statute would be repealed, unless the Florida legislature reenacted it. (Pl.'s Resp. SOF ¶ 54). The Florida legislature did not reenact the statute, which expired on October 1, 2007. (*Id.*). The Florida legislature reenacted the PIP Statute effective January 1, 2008 (the "2008 PIP Statute").

Before 2008, the PIP Statute permitted insurers to reimburse certain medical providers for 80% of the "reasonable expenses for medically necessary medical, surgical, X-ray, dental and rehabilitative services" (the "Reasonable Amount Method"). (Pl.'s Resp. SOF at ¶ 55 (citing Fla. Stat. § 627.736(1)(a) (2007)). Direct General received demands for payments from medical providers under that statute during the entire time period it offered PIP benefits in Florida. (*Id.*). The 2008 PIP Statute retains the Reasonable Amount Method, but also incorporates an additional methodology: insurers may use 200% of the Medicare Part B fee schedule to establish the reasonable expenses (the "Fee Schedule Method"). (*Id.* at ¶ 56 (citing

Fla. Stat. § 637.736(5)(a)(f)). The 2008 PIP Statute expressly stated that it was incorporated by reference into all auto insurance policies in Florida. (*Id.* at ¶ 57 (citing Fla. Stat. § 627.7407(2)).

Direct General implemented the Fee Schedule Method to determine the amount of its reimbursements to medical providers for auto accidents that occurred after January 1, 2008. (Pl.'s Resp. SOF ¶ 58; Defs.' SOF at ¶ 14). Direct General receives routine demands from healthcare providers seeking PIP benefits on a daily basis, and this has occurred since long before the 2008 Florida PIP Statute. (Pl.'s Resp. SOF ¶ 74).

**The Class Actions**

On June 19, 2008, Advantage Open MRI filed an action against Direct General in Florida state court (the "Advantage MRI Action"). (Defs.' SOF at ¶ 15). In its proposed Second Amended Complaint filed on October 3, 2008, Advantage MRI sought certification of a class consisting of all Florida healthcare providers "who provided MRI services to [Direct General's] PIP insureds since January 1, 2008 but did not receive payment in the full allowable amount under the participating physician's schedule of Medicare Part B for 2007…as a result of [Direct General's] applying Medicare's Hospital Outpatient Prospective Payment System…and/or some otherwise improper methodology." (*Id.* at ¶ 16; Pl.'s Resp. SOF at ¶ 61). Advantage MRI sought declaratory and injunctive relief regarding the alleged improper calculation of PIP benefits, but did not seek damages. (Defs.' SOF at ¶ 16). The Advantage MRI Action was voluntarily dismissed on November 23, 2010. (*Id.* at ¶ 17).

On September 11, 2012, MRI Associates of St. Pete filed another class action in Florida state court against Direct General (the "St. Pete MRI Action"). (Defs.' SOF at ¶ 18). The St. Pete MRI Action sought certification of a class of MRI providers contending that they were underpaid by Direct General because Direct General improperly calculated benefits under the PIP statute using the "Fee Schedule Method" rather than the "Reasonable Amount Method." (*Id.* at ¶ 19). Like the Advantage MRI Action, the St. Pete MRI Action seeks declaratory and injunctive relief regarding the alleged improper calculation of PIP benefits. (*Id.*). It

5

also contains breach of contract claims seeking payment of additional PIP benefits allegedly due. (*Id.*).

Direct General gave notice to Defendants of the Advantage MRI Action and St. Pete MRI Action on January 5, 2009, and October 8, 2012, respectively, seeking coverage for both actions under the 2008-2009 Policies. (Defs.' SOF at ¶ 20). Defendants accepted both actions for coverage under a reservation of rights. (*Id.*). Although the St. Pete MRI Action was filed after the expiration of the 2008-2009 Policy Period, Defendants' reservation-of-rights letters acknowledged that the St. Pete MRI Action and the Advantage MRI Action constituted Related Claims. (*Id.*).

On January 21, 2015, Direct General executed a Settlement Term Sheet with plaintiffs in the St. Pete MRI Action. (Pl.'s Resp. SOF at ¶ 71).

### The Individual Claims

On December 30, 2013, Direct General provided Defendants "notice of demands and complaints asserted against [Direct General] contending that [Direct General] misinterpreted the scope of its obligation to pay personal injury protection ('PIP') expenses under automobile insurance policies sold to Florida policyholders" (the "Individual Claims"). (Defs.' SOF at ¶ 21). In the letter, Direct General stated that the "demands and complaints on the spreadsheet on the enclosed cd are based on or directly or indirectly arising out of or resulting from the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events as the [Advantage MRI and St. Pete MRI Actions] and therefore are related claims falling within the same 2008-09 policy period." (*Id.*).

On January 3, 2014, Defendants received a CD containing a spreadsheet that consisted of more than 1,200 pages and listed more than 70,000 claims for which coverage was being sought under the 2008-2009 Policy (the "Notice Spreadsheet"). (Defs.' SOF at ¶ 22). The earliest claims listed on the Notice Spreadsheet were dated April 3, 2008, just after the Policy became effective. (*Id.*). The Notice Spreadsheet did not include certain PIP demand letters received by Direct General prior to the inception of the 2008-2009 Policy. (*Id.* at ¶ 23; Pl.'s SOF at ¶ 23).

On May 19, 2014, during the course of discovery in this action, Direct General identified and produced 30 PIP demands it acknowledged receiving between January 1, 2008 and March 30, 2008. (Defs.' SOF at ¶ 24). Four additional PIP demands received by Direct General during that time period were later identified. (*Id.*). Direct General produced claim files corresponding with those demands (the "Pre-Policy PIP Demands"). (*Id.*).

In a letter dated October 30, 2014, Direct General asserted that the Pre-Policy PIP Demands were not Claims for Wrongful Acts. (Defs.' SOF at ¶ 25). Direct General stated that, "[w]hile the class actions and subsequent lawsuits assert that [Direct General] committed a Wrongful Act by paying PIP Claims pursuant to the Fee Schedule Method rather than the Reasonable Amount Method, the [pre-policy] demands do not assert that [Direct General] committed this Wrongful Act." (*Id.*).

Three of the Pre-Policy PIP Demands are demand letters sent by the Law Offices of Gonzalez & Associates (the "Pre-Policy Gonzalez Demands"). (Defs' SOF at ¶ 28). Each of the Pre-Policy Gonzalez Demands is titled, "DEMAND LETTER UNDER FL. STATUTE § 627.736(10)" and states that the firm has been retained to represent the providers "in their claim[s] for overdue PIP benefits." (*Id.*). On its Notice Spreadsheet, Direct General coded at least 121 demand letters from the Law Offices of Gonzalez & Associates that were received after the inception of the 2008-2009 Policies as containing "permissible" allegations, and as therefore considered Related Claims. (*Id.*). Ten of those 121 demand letters from the Gonzalez firm were identical in substance and form to the Pre-Policy Claims, except for the names of the claimants and the amounts at issue. (*Id.*). Of the 30 Pre-Policy PIP Demands, 28 Claims share the same claim number as one or more of the Individual Claims listed on the Notice Spreadsheet.

One of the Pre-Policy PIP Demands resulted in a lawsuit against Direct General that was filed after the inception of the 2008-2009 Policies (the "Altamonte Suit"). (Defs' SOF at ¶ 30).[5] The Altamonte Suit and its corresponding Pre-Policy

---

[5] In Plaintiff's Response to Defendants' Statement of Facts [ECF No. 133], Plaintiff states that it received the demand letter from Altamonte Springs d/b/a Mid Florida Imaging on or about March 31, 2008, which would be after the inception of

PIP Demand involve the same claimant, same medical provider, same accident and same services. (*Id.*). The Altamonte Suit was listed on the Notice Spreadsheet and attached to Direct General's First Amended Complaint as an "exemplar" of the Related Claims for which it seeks coverage. (*Id.*).

One of the Pre-Policy PIP Demands was received by Direct General on March 26, 2008 from Health & Well Being Therapy. (Defs' SOF at ¶ 31). This demand letter involved the same claimant, same medical provider and same services as two later demand letters listed on the Notice Spreadsheet. (*Id.*). The two later demand letters were coded by Direct General's reviewers as containing "permissible" allegations and therefore considered Related Claims. (*Id.*).

Several demands listed on the Notice Spreadsheet, which were coded by Direct General's reviewers as containing "permissible" allegations, merely allege that Direct General has not yet paid any benefits. (Defs' SOF at ¶ 32). 26 of the 30 "exemplar" complaints attached to Direct General's First Amended Complaint do not contain any allegations regarding a specific payment methodology. (*Id.* at ¶ 33). Ten of the demand letters contained in Direct General's sample were coded by Direct General's reviewers as containing "permissible" allegations under the category of "General PIP." (*Id.* at ¶ 34). These demand letters seek reimbursement under the PIP statute without alleging that the underpayment was attributable to any particular payment methodology. (*Id.*).

### Settlement of the Individual Claims

Direct General alleges that it paid approximately $62 million to settle and approximately $10.3 million to defend the Individual Claims listed on its Notice

---

the 2008-2009 Policies. (Pl.'s Resp. SOF ¶ 30). But, Plaintiff does not provide any record evidence that the demand letter was not received prior to the inception of the 2008-2009 Policies. The record shows that the Mid Florida Imaging demand letter was listed on the Notice Spreadsheet as having a "receipt date" of March 19, 2008 for claim 0001129705. (*See* ECF No. 120-20 at ¶ 10; ECF No. 122-5 at 8; ECF No. 122-4 at 15). Thus, it is undisputed that the demand came prior to the inception of the 2008-2009 Policies. *See Rosa-Nales v. Carnival Corp.*, No. 12-22172-CIV, 2013 WL 7219411, at *1 (S.D. Fla. Dec. 11, 2013) (stating that facts in defendants' statement of facts in support of motion for summary judgment were deemed admitted "to the extent that they are supported by evidence in the record and are not specifically disputed by Plaintiff").

Spreadsheet. (Defs' SOF at ¶ 35). The parties dispute whether Direct General sought consent from the Excess Insurers in connection with these expenditures. (*Id.*; Pl.'s Resp. SOF at ¶ 35).

### The Instant Coverage Action

In its First Amended Complaint (the "Complaint") (ECF No. 37), Direct General alleges that "health care providers (as assignees of Direct General policyholders) have asserted numerous individual demands and lawsuits against Direct General in which they allege substantially the same circumstances as the Advantage MRI Complaint and the St. Pete MRI Complaint…." (Compl. ¶ 23). Direct General further alleges that, "[t]he Advantage MRI Complaint presumably would have incorporated these Individual Claims had it not been voluntarily dismissed." (*Id.* ¶ 24). Direct General further alleges that, "The PIP Claims (so called herein), collectively consisting of the Advantage MRI Complaint, the St. Pete MRI Complaint, and each of the Individual Claims, are based on or directly or indirectly arise out of or result from the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events." (*Id.* ¶ 26).

## II.   LEGAL STANDARDS

Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant has the burden of demonstrating through depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials, the absence of any genuine material, factual dispute. *Id.*

An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). An issue is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.*

In order for a movant to be entitled to summary judgment, he bears the initial burden of establishing the nonexistence of a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). On summary judgment, it is not the function of the

Court to resolve conflicting views of the evidence. When viewing the evidence on a motion for summary judgment, the Court is required to draw all reasonable inferences in favor of the non-moving party. *Id.*

### III.   DISCUSSION

#### A. Applicable Law

In diversity cases, the choice-of-law rules of the forum state determine which state's substantive law applies. *American Family Life Assur. Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 830 (11th Cir. 1989). Under Florida choice-of-law rules, interpretation of insurance contracts is governed by the law of the place of making. *Lumbermens Mut. Cas. Co. v. August*, 530 So. 2d 293, 295 (Fla. 1988). The parties here do not dispute that Tennessee law governs.

"In general, courts should construe insurance contracts in the same manner as any other contract." *Alcazar v. Hayes*, 982 S.W.2d 845, 848 (Tenn. 1998).

> The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles. It is the Court's duty to enforce contracts according to their plain terms. Further, the language used must be taken and understood in its plain, ordinary and popular sense. The courts, of course, are precluded from creating a new contract for the parties.

*Id.*

#### B. Defendants' Relatedness Argument

Defendants move for summary judgment on the grounds that the claims for which Direct General seeks coverage are related to earlier, pre-policy demands. Defendants argue that under the Policy, Related Claims are treated as a single Claim made when the earliest of the Related Claims was made; therefore, because the earliest claims under Defendants' argument were made before the Policy was in effect, the entire universe of Related Claims is not covered by the Policy. Plaintiff argues that the pre-policy demands received by it were garden-variety PIP demands which it routinely received and that those demands are not Claims under the Policy, and are therefore not Related Claims.

The Followed Policy, whose terms generally govern the Excess Insurers' Policies, states, in relevant part, "[t]he Insurer will pay on behalf of the **Insured Loss**

10

from **Claims** first made against the **Insured** during the **Policy Period**…for **Wrongful Acts** first committed on or after the Retroactive Date [September 28, 1983]." (Pl.'s Resp. SOF at ¶¶ 4, 44). Thus, the only coverage available under the Policy is for (1) "Claims" (2) "first made" (3) "against the Insured during the Policy Period." In other words, and unremarkably, if a Claim is not first made during the Policy Period, it will not be covered.

A "Claim" is defined as "any civil proceeding," and any "written demand or notice to an **Insured** indicating that a person or entity intends to hold an Insured responsible for a **Wrongful Act**." (*Id.* at ¶ 7; Pl's Resp. SOF at ¶ 46). The term **Wrongful Act** includes "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary duty or other duty committed by an **Insured** in rendering, or in failing to render, **Professional Services**." (Defs.' SOF at ¶ 8). The term **Professional Services** is defined as "services performed by the **Insurance Company**…for a policyholder, customer or client…, which, alone or in combination with other services, are performed for monetary consideration pursuant to a policy of insurance or other **Express Contract or Agreement**." (Pl.'s Resp. SOF at ¶ 9). These terms are exceptionally broad. To simplify, a "Wrongful Act" under the Policy is, at a minimum, an alleged error committed by Direct General in rendering any service performed for its policyholders for monetary consideration pursuant to an insurance policy. This definition easily includes an error by Direct General in the amount of money it pays under its automobile insurance policies and Florida PIP law to reimburse medical providers for services rendered to Direct General's insureds. A "Claim," in turn, includes a demand or notice to Direct General indicating an intent to hold Direct General responsible for such a "Wrongful Act." Thus, a demand letter asserting that Direct General failed to pay or underpaid medical providers under the terms of its automobile insurance policy and Florida PIP law is a Claim under the Policy's broad definition.

The 2008-2009 Policy states that "[a]ll **Related Claims** will be treated as a single **Claim** made when the earliest such **Related Claims** was first made or when the earliest of such **Related Claims** is treated as having been made…, whichever is

11

earlier." (Pl.'s Resp. SOF at ¶ 5). The term **Related Claims** includes "all **Claims** for **Wrongful Acts** based on or directly or indirectly arising out of or resulting from the same or related…series of facts, circumstances, situations, transactions, or events." (Defs.' SOF at ¶ 6). In other words, when a claim is made within the Policy period, a Related Claim made after the Policy period would still be deemed covered under the Policy because both Claims are deemed one Claim made on the earlier, within-Policy-period date.

Plaintiff initially sought coverage from Defendants on January 5, 2009 for the Advantage MRI Action. The Advantage MRI Action was commenced during the Policy period on June 19, 2008. On October 3, 2008, Advantage MRI sought certification of a class consisting of all Florida healthcare providers who provided MRI services to Direct General's PIP insureds since January 1, 2008 but did not receive adequate PIP benefits as a result of Direct General's methodology for determining payment amounts. Direct General has coined this legal theory the "Permissive Methodology Theory." On November 23, 2010, the Advantage MRI Action was voluntarily dismissed.

On September 11, 2012, the St. Pete MRI Action was filed. That class action was substantively similar to the Advantage MRI Action – it too sought certification of a class of MRI providers contending that they were underpaid by Direct General because Direct General improperly calculated benefits under the PIP statute using the "Fee Schedule Method" rather than the "Reasonable Amount Method." On October 8, 2012, Direct General sought coverage from Defendants for the St. Pete MRI Action. Defendants accepted both the Advantage MRI Action and the St. Pete MRI Action for coverage under a reservation of rights. Defendants' reservation-of-rights letter acknowledged that the Advantage MRI Action and the St. Pete MRI Action were Related Claims under the Policy. Accordingly, while the St. Pete MRI Action was commenced after the Policy period, it was deemed to have been made when the earlier, related Advantage MRI Action was commenced. Since the earlier Advantage MRI Action fell within the Policy period, the related St. Pete MRI Action was also deemed to have been made within the Policy period.

This enured to the benefit of Plaintiff and Defendants for different reasons. For Plaintiff, it meant that it only had to cover one $1 million per Claim retention. For Defendants, it meant that only one Policy period was covered, limiting their exposure to the maximum coverage amount available for one Policy period, not multiple Policy periods.

On or about December 30, 2013, Direct General provided Defendants with a CD containing a spreadsheet that consisted of more than 1,200 pages and listed more than 70,000 claims for which Direct General was seeking coverage under the 2008-09 Policies (the "Notice Spreadsheet"). In the cover letter accompanying the Notice Spreadsheet, Plaintiff stated, "The demands and complaints on the spreadsheet on the enclosed cd are based on or directly or indirectly arising out of or resulting from the same or related facts, circumstances, situations, transactions, or events or the same or related facts, circumstances, situations, transactions, or events as the [Advantage MRI Action and the St. Pete MRI Action] and therefore are related claims falling within the same 2008-2009 policy periods." (ECF No. 120-17). The Notice Spreadsheet listed only claims made after April 3, 2008.

Defendants later learned that Plaintiff had received 34 PIP demand letters (the "Pre-Policy Claims") from January 1, 2008 to March 30, 2008, some of which came from the same claimants whose claims were listed on the Notice Spreadsheet. These Pre-Policy Claims are at the heart of Defendants' relatedness argument. Defendants argue that all of the Claims for which Direct General seeks coverage as one Related Claim (the Advantage MRI Action, the St. Pete MRI Action, and the claims listed on the Notice Spreadsheet, referred to collectively here as the "Within-Policy Claims") are actually related to at least some of these Pre-Policy Claims, and since that would mean that all the claims must be deemed as one Related Claim made during the pre-policy period, then there is no coverage for this Related Claim under the 2008-2009 policy. Plaintiff opposes this contention on several grounds.

First, Plaintiff argues that the Pre-Policy Claims are not related to the Within-Policy Claims because none of the routine Pre-Policy Claims presented the Permissive Methodology Theory. The Policy, however, does not define Related Claims by whether the separate claims present the same legal theory. Rather, the

Policy defines **Related Claims** as "all **Claims** for **Wrongful Acts** based on or directly or indirectly arising out of or resulting from the same or related…series of facts, circumstances, situations, transactions, or events." (Defs.' SOF at ¶ 6). This is a very broad definition. It requires only that the claims "indirectly aris[e] out of" related circumstances. Prior to the Defendants' discovery of the Pre-Policy Claims, Plaintiff itself had taken the position that the Policy's definition of "Related Claims" permitted it to deem the Advantage MRI Action, the St. Pete MRI Action, and the multitude of demands and complaints listed on the Notice Spreadsheet as one Related Claim. A number of the Claims on the Notice Spreadsheet are routine demand letters that are identical (except for the names of the claimants and amounts at issue) to three of the Pre-Policy Claims. (*See* Defs.' SOF at ¶ 28; Pl.'s Resp. SOF at ¶ 28). Twenty-eight of the Pre-Policy Claims share the same claim number as one or more of the claims listed on the Notice Spreadsheet. (*See* Defs.' SOF at ¶ 29; Pl.'s Resp. SOF at ¶ 29). Thus, comparing the Pre-Policy Claims to the claims identified on Plaintiff's Notice Spreadsheet supports Defendants' argument that the Pre-Policy Claims are Related Claims, and is consistent with Plaintiff's own characterization (as of December 30, 2013) that all of the claims listed on the Notice Spreadsheet are Related Claims to the two class actions for which Direct General sought coverage.

One of the Pre-Policy Claims is a demand letter involving the same claimant, same medical provider, same accident and same services as a complaint that was filed against Direct General four years later (the "Altamonte Suit"). (*See* Defs.' SOF at ¶ 31; Pl.'s Resp. SOF at ¶ 31). Plaintiff listed the Altamonte Suit among the claims contained in the Notice Spreadsheet and it also attached that complaint to its First Amended Complaint as an "exemplar" of the claims for which it sought coverage. *See* First Am. Compl. ¶ 33 and Ex. C (ECF No. 37-3) at 46-47. The Altamonte Suit contains no allegation that Direct General underpaid plaintiff because it applied a particular payment methodology; it merely claims that Direct General underpaid plaintiff under the terms of its automobile insurance policy and Florida's PIP statute. (ECF No. 37-3 at 46-47). With respect to the Pre-Policy Claim that later became the basis for the Altamonte Suit, both the initial claim and the later lawsuit arose out of the same circumstances – Direct General's payment methodology following the

change in Florida's PIP law on January 1, 2008. Because the initial demand constitutes a Claim under the Policy,[6] any Related Claims that come after it are deemed to have been made at the time of the earlier, pre-policy Claim.

Defendants cite to *Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.*, 499 F. App'x 559 (6th Cir. 2012) for support of their relatedness argument. In *Cracker Barrel*, the Court held that the insured under several consecutive Employment Practices Liability Insurance policies was not covered under the policies for an EEOC class action suit because numerous of the underlying charges of discrimination pre-dated the relevant policy periods. Thus, the EEOC claim was deemed to have been first made when the related charges of discrimination were served on the insured prior to the policy periods. Similarly, here Direct General received related claims prior to the policy period. Specifically, the Altamonte demand letter was received by Direct General prior to March 30, 2008, when the Policy period began. That demand led to the Altamonte Suit, one of the individual claims for which Direct General seeks coverage under its own interpretation of the Related Claims provision of the Policy. Accordingly, I cannot agree with Plaintiff that the Pre-Policy Claims are not related simply because they fail to specify a Permissive Methodology Theory.

Second, Plaintiff argues that relatedness is a factual determination precluding summary judgment because facts are in dispute. I disagree. There is no dispute that Direct General received the Pre-Policy PIP demand that later resulted in the Altamonte Suit, which Direct General itself characterizes as an "exemplar" individual claim related to the class actions and the other individual claims included in the Notice Spreadsheet. Under the Policy's broad definition of Related Claims – a term that Direct General itself interpreted broadly to allow it to find relatedness between two class action complaints and voluminous individual claims made after the Policy period – the Altamonte Pre-Policy PIP demand and the Altamonte Suit are Related Claims, along with the other claims for which Direct General seeks

---

[6] A "Claim" is defined as "any civil proceeding," and any "*written demand* or notice to an **Insured** indicating that a person or entity intends to hold an Insured responsible for a **Wrongful Act**." (italics added).

coverage. Even if there are factual disputes as to other Pre-Policy PIP demands, the Court need only find one such demand that is related to the other Related Claims to find that the universe of Related Claims is to be deemed made prior to the inception of the Policy.

Third, Plaintiff argues that by deeming a Pre-Policy PIP demand as being related to a later demand arising from the same accident, the Court would be converting claims-made policies into occurrence policies, in which the date of the occurrence determines the operative policy period. I disagree. It is the Policy which defines a Claim to include a written demand, and so long as the Court looks at the date Plaintiff received the demand, it is complying with the plain meaning of the Policy. If that demand further meets the definition of "Related Claim," meaning that the latter made Claims are deemed to have been made at the time of the earlier demand, then the Related Claim falls outside of the covered Policy period. This analysis does not require the Court to look at the date of the occurrence, but at the date of the Claim.

Fourth, Plaintiff argues that its reasonable expectation was that not every demand for PIP benefits would constitute a Claim. It cites to the Amend Notice Provision Endorsement (Endorsement 6) for support of its argument. That provision states:

> As a condition precedent to any right to payment in respect of any **Claim**, the Insured must give the Insurer written notice of such **Claim**, with full details *as soon as practicable after the Claim is first made and the risk manager or general counsel of the Insurance Company first becomes aware of such Claim,* but in no event later than (60) days after the end of the Policy Period. A **Claim** is first made when an Insured first receives notice of the filing of a complaint, notice of charges, a formal investigative order or similar document…when the Insured first receives written demand or notice that constitutes a **Claim**.

(Pl.'s Resp. SOF at ¶ 52) (italics added). I disagree that the Amend Notice Provision Endorsement supports Plaintiff's position that it reasonably expected that routine PIP demands were not considered Claims under the Policy. The definition of Claim is not altered by the Amend Notice Provision Endorsement. Claim is broadly defined in the Policy and includes a "written demand or notice to an **Insured** indicating that

a person or entity intends to hold an Insured responsible for a **Wrongful Act**." (*Id.* at ¶ 7; Pl's Resp. SOF at ¶ 46). The term **Wrongful Act** includes "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary duty or other duty committed by an **Insured** in rendering, or in failing to render, **Professional Services**." (Defs.' SOF at ¶ 8). The term **Professional Services** is defined as "services performed by the **Insurance Company**…for a policyholder, customer or client…, which, alone or in combination with other services, are performed for monetary consideration pursuant to a policy of insurance or other **Express Contract or Agreement**." (Pl.'s Resp. SOF at ¶ 9). These definitions encompass a demand letter for PIP benefits – the fact that they are demands renders them Claims; the Wrongful Act is the alleged failure to adequately pay in accordance with the insurance policy and PIP law; and the payment under the insurance policy and PIP law is a Professional Service because it is performed for monetary consideration.

The Amend Notice Provision Endorsement simply does not change these definitions. It speaks to a different requirement that Direct General had to meet to receive payment for any Claim. Direct General was required to provide written notice to Defendants of a Claim, "*as soon as practicable after the Claim is first made and the risk manager or general counsel of the Insurance Company first becomes aware of such Claim,* but in no event later than (60) days after the end of the Policy Period." (Pl.'s Resp. SOF at ¶ 52) (italics added). Importantly, the Amend Notice Provision Endorsement specifies that, "A **Claim** is first made when…the Insured first receives written demand or notice that constitutes a **Claim**." (*Id.*). Thus, the Amend Notice Provision Endorsement does not affect the determination of when a Claim is deemed to have been made, and does not alter the definition of the term, "Claim." It only imposes certain requirements on Direct General as to the timing of the notice it is required to give Defendants after it receives a Claim. Under the Amend Notice Provision Endorsement, a Claim could be made on Day 1 of the Policy period, but Direct General would not be obligated to provide notice of that Claim until "as soon as practicable" thereafter **and** after the general counsel first becomes aware of such

Claim, but no later than 60 days past the Policy period. The timing of when Plaintiff's general counsel receives notice of demands is a matter wholly within Plaintiff's control. In sum, the notice provision is separate and apart from the provisions defining covered Claims, and Direct General could not have reasonably expected that it altered the Policy to exclude PIP demand letters that otherwise met the Policy's definition of the term, "Claim."

Moreover, to the extent that Direct General argues that under professional liability insurance policies, such as the ones at issue here, the insurer "does not need or want notice of the typical claims that the policyholder is adjusting for its own insureds," the Policy here accounts for that by requiring a $1,000,000 per Claim retention. Thus, the insured under the Policy at bar would not typically seek coverage for every single PIP demand letter it receives because, under normal circumstances, that Claim would never be resolved for more than $1,000,000. That does not, however, mean that the routine PIP demands are not Claims under the Policy's terms. Here, in fact, Direct General *does* seek coverage for otherwise *typical* PIP demands and complaints because they arise from the common circumstance of Direct General's chosen payment methodology after the Florida PIP law changed, a potential business strategy employed by Direct General at the time. While this circumstance is unique and unlikely to repeat itself, Direct General must bear the burden of its decision not to provide Defendants with notice of PIP demands that otherwise met the definition of a Claim on the belief that the Defendants did not "need or want" such notice. Direct General cannot, on the one hand deem otherwise vanilla demands and complaints as related when it is convenient to Direct General (*see* Notice Spreadsheet), and on the other hand, exclude the substantively identical Altamonte PIP demand because to include it would mean that the entire universe of the underlying related claims would be deemed made prior to the Policy period. All the Court can do is give the Policy the interpretation called for by the plain meaning of its terms. Direct General is a sophisticated insurance company that could have negotiated policy terms to specifically exclude the routine PIP demands it admits having received since it began offering automobile insurance policies to Floridians.

Plaintiff's final grounds for opposing Defendants' relatedness argument is that the term, "Related Claims," is ambiguous because it is inconsistent with three policy provisions, and that it must therefore be read in favor of the insured, Direct General. The first policy provision purportedly inconsistent with the "Related Claims" provision is the Amend Notice Provision Endorsement cited above. Plaintiff states that, "Under the Excess Insurers' definition of **Claim**, Direct would have been required to provide notice to its insurers of a **Claim** *before* the 'risk manager or general counsel…first becomes aware of [a] **Claim**,' in direct contradiction to that endorsement." I disagree. Direct General is simply required to provide notice of a Claim "as soon as practicable" after it is made **and** after the general counsel first becomes aware of such Claim, but in no event after sixty days passed the Policy period. So, for example, if a PIP demand letter is received by Direct General on Day 1 of the Policy Period, Direct General would have the entire Policy period plus sixty days in which to make its general counsel aware of that Claim and to provide notice to its insurers. There is nothing inconsistent about this notice provision and the Related Claims definition, and Direct General had complete control of how and when to inform its general counsel of a Claim.

Plaintiff next argues that the Defendants' interpretation of the Related Claims provision contradicts the Retroactive Date provision, which extends coverage for "**Claims** first made against the **Insured** during the Policy Period…for **Wrongful Acts** first committed on or after" September 28, 1983. I disagree. Nothing about Defendants' interpretation of the Related Claims provision dictates that **Wrongful Acts** committed prior to January 1, 2008 are not covered, so long as the earliest of the Related Claims falls within the Policy period.

Finally, Plaintiff argues that:

> [T]he Excess Insurers' construction of the Policy obliterates Direct's coverage for professional liability claims because each time a professional liability Claim comes to the attention of Direct's general counsel, the Excess Insurers will no doubt argue that an unknown predecessor auto insurance policy claim lies within the tens of thousands of auto insurance policy claims that Direct regularly receives; and that the predecessor claim, which of course falls within a

> prior policy period, also pushes the Claim on which Direct gives notice
> into that prior policy period, for which no coverage remains.

(ECF No. 132 at 23). This slippery slope argument is based on pure hypotheticals. Moreover, Direct General controlled when and how its general counsel became aware of Claims, and it could have negotiated to eliminate routine PIP demands from the definition of Claim because, not only is Direct General a sophisticated corporation, it is a sophisticated *insurance* corporation. *See Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257, 1260-61 (5th Cir. 1976) ("We do not feel compelled to apply, or, indeed, justified in applying the general rule that an insurance policy is construed against the insurer in the commercial insurance field when the insured is not an innocent but a corporation of immense size, carrying insurance with annual premiums in six figures, managed by sophisticated business men, and represented by counsel on the same professional level as the counsel for insurers."). I am unconvinced that Defendants' construction of the Policy somehow renders the Policy illusory.

## IV.   CONCLUSION

For the foregoing reasons, Defendants have met their burden of establishing their entitlement to summary judgment. Under the Policy's broad definition of Related Claims, the Pre-Policy PIP demands are related to the Within-Policy Claims for which Plaintiff seeks coverage. Thus, all of the claims collectively are deemed one Claim made prior to the inception of the Policy period, and there is no coverage under the Policy.

Accordingly, it is **ORDERED and ADJUDGED** that

(1) Defendants' Joint Motion for Summary Judgment (ECF No. 119) is **GRANTED**.

(2) All remaining motions are **DENIED as moot**.

(3) The CLERK is **DIRECTED** to **CLOSE** this matter.

**DONE and ORDERED** in chambers, at Miami, Florida, this 30th day of September 2015.

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of record*